# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
January 3, 2013 Session

## STATE OF TENNESSEE v. NICKOLUS L. JOHNSON

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Sullivan County**
**No. S50059      R. Jerry Beck, Judge**

**No. E2010-00172-SC-DDT-DD - Filed April 19, 2013**

A jury convicted the defendant of premeditated first degree murder for shooting and killing a police officer. As the penalty phase of the trial began, the defendant refused to allow his lawyers to present mental health mitigation evidence. After questioning the defendant about his decision, the trial court directed two mental health experts to evaluate the defendant's mental competency. After the evaluation, the mental health experts testified that they could not render an opinion as to the defendant's competency because the defendant had refused to cooperate. The trial court ruled that the defendant had failed to overcome the presumption of competency and was therefore competent to waive the presentation of expert mental health testimony. The State proved the existence of two aggravating circumstances pursuant to Tennessee Code Annotated sections 39-13-204 (i)(2) and (9) (2006). The defendant presented testimony from family and friends. The jury sentenced the defendant to death. The Court of Criminal Appeals affirmed the defendant's conviction and sentence. *State v. Johnson*, No. E2010-00172-CCA-R3-DD, 2012 WL 690218 (Tenn. Crim. App. Mar. 5, 2012). We hold that a mentally competent defendant may waive the presentation of mitigation evidence during the penalty phase of a capital trial. We further hold that (1) the evidence does not preponderate against the trial court's ruling that the defendant was mentally competent to waive the presentation of mitigation evidence; (2) the trial court did not err in overruling the defendant's motion for a mistrial based on the State's improper reference to abortion during its closing argument; (3) the defendant's challenge to the constitutionality of Tennessee's death penalty is without merit; and (4) based on our review of the death sentence, as required by Tennessee Code Annotated section 39-13-206(c) (2010), the death sentence was not imposed in an arbitrary fashion; the evidence supports the jury's finding of statutory aggravating circumstances; the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. We affirm the defendant's first degree murder conviction and sentence of death.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

SHARON G. LEE, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

James Thomas Bowman, Johnson City, Tennessee, and Stacy L. Street, Elizabethton, Tennessee, for the appellant, Nickolus L. Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; H. Greeley Wells, District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.

### A. Factual Background

Officer Mark Vance of the Bristol Police Department was shot and killed on November 27, 2004, while responding to a dispatch call at the home of Walter Mitchell. Mr. Mitchell, a long-distance truck driver, lived on Belmont Drive in Bristol, Tennessee with his twin seventeen-year-old daughters, B.M. and T.M.[1], and B.M.'s one-year-old son. On the evening of November 27, Mr. Mitchell left his home to pick up a load of goods for his employer. His grandson, two daughters, and two of their friends remained at the home. Not long after Mr. Mitchell left his home, B.M. called him to report that a man was at the house threatening her with a gun. Mr. Mitchell called 9-1-1 and turned his truck around to go home.

The armed man at the Mitchell residence was the defendant, Nickolus Johnson. Mr. Johnson and B.M. had been seeing each other socially, and B.M. was pregnant by him. Mr. Johnson was twenty-six years old and already had two young children by two different women. He insisted that B.M. have an abortion, but B.M. refused. Earlier that evening, they argued over the telephone about her pregnancy and her refusal to have an abortion. Mr. Johnson became angry and B.M. abruptly ended the discussion. About ten minutes later, Mr. Johnson arrived unexpectedly at the Mitchell home, entered the house, and started pacing

---

[1] B.M. and T.M. are identified by their initials because they were minors during the events of this case.

back and forth, "yelling and cussing." Mr. Johnson, armed with two guns, was worried that Mr. Mitchell would press statutory rape charges against him, and he threatened to kill B.M. and her father. Mr. Johnson laid the guns on the coffee table in the living room, but later picked up the guns and put them in his pocket. Mr. Johnson threatened to kill the first person who walked through the door. He vowed that he would go to prison for murder, but not for statutory rape. Termaine McMorris, a mutual friend of Mr. Johnson and B.M., arrived at the house and tried unsuccessfully to calm Mr. Johnson. Meanwhile, B.M. continued to talk to her father on the telephone. When she told Mr. Johnson that her father had called the police, he responded that the "police can't dodge these shells" and threatened to shoot any police officer who arrived at the house.

Officer Vance was dispatched to the Mitchell residence. From an upstairs bedroom window, Mr. Johnson watched Officer Vance arrive. T.M. and Mr. McMorris met Officer Vance on the front porch and told him everything was "okay." Officer Vance insisted that he still needed to go into the house. T.M. and Mr. McMorris entered the split-level home first and proceeded up the stairs. Officer Vance was right behind them armed only with his flashlight; his gun was still holstered. Mr. Johnson was standing out of sight in the upstairs hallway. As Officer Vance reached the hallway and living room area at the top of the stairs, Mr. Johnson, from a distance of one to two feet, shot Officer Vance in the head, mortally wounding him. No words were exchanged before the shot was fired. Mr. Johnson immediately threw one of his guns into the living room and said "I'm out." As he was going out of the front door, Mr. Johnson laid down the other gun.

Lieutenant Eric Senter, also of the Bristol Police Department, arrived at the Mitchell residence at the same time as Officer Vance was entering the home. Lt. Senter watched Officer Vance enter the residence and proceed up the stairs. As Lt. Senter was walking to the front door, he saw an arm holding a gun extend from the hallway toward Officer Vance and heard the gun blast. Lt. Senter retreated behind a nearby tree and called for back-up.

Officer Daniel Graham of the Bristol Police Department arrived at the scene as Lt. Senter took cover behind the tree. Mr. Johnson ran out of the house, followed by Mr. McMorris. Lt. Senter shouted at the two men and ordered them to lie on the ground. T.M. carried the gun out of the house and repeatedly shouted "why did you shoot him?" T.M. was also ordered to lie on the ground. As Mr. Johnson was being handcuffed, he said that he had "shot the fucker." Lt. Senter asked him who he had shot and Mr. Johnson said "I shot the fucking cop. . . . I shot him in the head. He's dead. . . . Ain't no use of going in there." Then Mr. Johnson began laughing. According to Mr. Johnson, he shot Officer Vance because Mr. Johnson did not call the police and did not want the police there. After the officers placed Mr. Johnson in a patrol cruiser, Mr. Johnson continued to laugh about shooting Officer Vance.

-3-

The officers then entered the residence and discovered Officer Vance lying in the upstairs hallway, shot once in the head. Bristol Police Officer Bradley Michael Tate arrived shortly afer the shooting and attempted to provide medical assistance, but Officer Vance was not breathing, in cardiac arrest, and had no pulse. According to Dr. William McCormick, Deputy Chief Medical Examiner for the State of Tennessee, the bullet entered Officer Vance's right eye and proceeded in a sharp downward angle, causing massive shattering of the middle and anterior cranial parts. Officer Vance died "as the result of a single intermediate range gunshot wound to the face, with the entrance slightly above the right eye about the level of the mid-eyebrow with destruction of the skull[,] damage to the brain[,] . . . and bleeding."

## B. Procedural Background

The grand jury in Sullivan County returned a one-count indictment charging Mr. Johnson with the premeditated and intentional killing of Officer Vance in violation of Tennessee Code Annotated section 39-13-202(a)(1) (2006).[2] The State timely filed notice of its intent to seek the death penalty pursuant to Tennessee Rule of Criminal Procedure 12.3(b)(1). The State cited as aggravating circumstances that the defendant had previously been convicted of one or more felonies involving the use of violence to the person, Tenn. Code Ann. § 39-13-204(i)(2), and that the murder was committed against a law enforcement officer who was engaged in the performance of official duties and the defendant knew or should have known that the victim was a law enforcement officer engaged in the performance of official duties, Tenn. Code Ann. § 39-13-204(i)(9).[3]

At trial, the State presented testimony from eyewitnesses to the murder and testimony from other witnesses regarding forensic evidence collected at the scene. Mr. Johnson

---

[2] Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another[.]"

[3] Tennessee Code Annotated section 39-13-204 provides in part:
(i) No death penalty . . . shall be imposed, except upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which are limited to the following:
. . . .
(2) The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;
. . . .
(9) The murder was committed against any law enforcement officer . . . who was engaged in the performance of official duties, and the defendant knew or reasonably should have known that the victim was a law enforcement officer . . . engaged in the performance of official duties.

presented no proof. On April 24, 2007, the jury convicted Mr. Johnson of first degree murder.

As the penalty phase of the trial began, defense counsel advised the trial court that Mr. Johnson had instructed them not to present any mitigation evidence. Defense counsel had planned to call a number of mitigation witnesses to testify to Mr. Johnson's family and social background and his mental health. Faced with this turn of events, counsel advised the trial court of their desire to present mitigation evidence over Mr. Johnson's objection unless the court prohibited them from doing so.

The trial court, pursuant to *Zagorski v. State*, 983 S.W.2d 654 (Tenn. 1998), questioned Mr. Johnson about his decision to waive mitigation evidence. Mr. Johnson acknowledged that he understood the significance of mitigation evidence in the penalty phase, he knew that he had a right to present mitigation evidence, he knew that his counsel were prepared to present mitigation evidence on his behalf, and he had made a voluntary decision not to allow his counsel to present the evidence. Mr. Johnson also acknowledged that he understood "mitigating factors as believed by the [j]ury or a juror . . . could save [him] from a death sentence . . . ."

As to his reason for waiving the presentation of mitigation evidence, Mr. Johnson told the trial court: "I like to cut the chase. I do not want no mitigating circumstances. It is as simple as that. . . . I got my reasons. I've told my lawyers my reasons. . . ." In Mr. Johnson's opinion, presenting mitigation evidence would be a waste of time. He noted that he believed one of the jurors was a member of the Ku Klux Klan and that another was a Mason[4] who had been sleeping during the trial. He also explained that he did not want to beg the jury for sympathy because he did not believe that any evidence he presented would make a difference in his sentence. Mr. Johnson told the trial court that "whatever's going to happen is going to happen regardless."

The trial court then asked defense counsel whether they had investigated the issue of mitigation evidence and had informed Mr. Johnson of its existence. Defense counsel explained that they had done so. Defense counsel also confirmed that they had discussed the matter with Mr. Johnson and explained the potential consequences of waiving the presentation of mitigation evidence. When asked if they had any evidence that Mr. Johnson was not competent to waive the presentation of mitigation evidence, defense counsel told the

---

[4] It appears that Mr. Johnson was expressing a belief that one of the jurors was a Freemason. Freemasonry refers to an international fraternal organization that generally limits membership to men and traces its origins back to medieval Europe. *See, e.g., Bressler v. Am. Fed'n of Human Rights*, 44 F. App'x 303, 307-11 (10th Cir. 2002).

trial court that "the fact that a defendant is willing to roll over and let a jury kill him is evidence of his incompetence" and that "[a]nybody who would forego the opportunity to save his life is incompetent." Defense counsel, however, admitted that they had "no expert proof that [they] could tender to the court that [Mr. Johnson was] not competent to make that decision." The trial court then recessed for the evening to allow Mr. Johnson to reconsider his decision overnight.

When the trial court reconvened the next day, Mr. Johnson reaffirmed his decision to waive the presentation of mitigation evidence. Mr. Johnson reiterated that he wished to "cut the chase and quit playing games." Defense counsel cited to Mr. Johnson's statements that one juror was in the Ku Klux Klan and another was a Mason as additional indications of his incompetency. After further discussion by the trial court and counsel, Mr. Johnson informed his counsel that he had changed his mind and would allow them to present mitigation evidence as long as it was not "mental health." Defense counsel advised the trial court that Mr. Johnson had altered his decision after his mother had passed him a note. Counsel asserted that this change in position also reflected adversely on Mr. Johnson's competency. However, the trial court noted that defendants frequently discuss trial strategy with family members and friends, and that it is not irrational to expect that a defendant would rely on their advice and insight. The trial court again addressed Mr. Johnson, explaining that as the captain of his case, he controlled the direction of his case. Mr. Johnson responded that as captain, he did not want "mental or . . . doctors, psychologists, psychiatrists" but his counsel could present testimony from his family and "everybody else."[5]

The trial court directed two expert witnesses, Dr. Steven Lawhon, a clinical psychologist retained by the State, and Dr. William Bernet, a forensic psychiatrist from Vanderbilt University retained by Mr. Johnson, to examine Mr. Johnson. Drs. Lawhon and Bernet, who were at the trial waiting to testify, proceeded with the examination.

Later that day when the trial court reconvened, both doctors testified they were unable to reach a conclusion regarding Mr. Johnson's competency because he had refused to participate in the examination. Dr. Bernet testified that Mr. Johnson's refusal to cooperate may have been indicative of his incompetency, but could also have been the fruit of a logical, calculated refusal. Dr. Bernet also observed that Mr. Johnson displayed characteristics

---

[5] Mr. Johnson also informed the trial court that he wanted to fire defense counsel because they did not care about his family, had tricked him, and were not on his side. However, when the trial court inquired as to whether Mr. Johnson wished to defend himself, Mr. Johnson adamantly declined. The trial court offered Mr. Johnson the choice between discharging his defense counsel and representing himself or being represented by his current defense counsel. After a lengthy discourse with the trial court, Mr. Johnson elected to continue with defense counsel.

consistent with both competency and incompetency. Similarly, Dr. Lawhon testified that he was unable to reach a definitive conclusion regarding Mr. Johnson's competency and described how Mr. Johnson's conduct was consistent with both competency and incompetency. Both doctors' testimony indicated that they might have reached a more conclusive opinion had Mr. Johnson participated in the evaluation.

Mr. Johnson presented no evidence on the issue of competency other than defense counsel's observations and opinions. In ruling on Mr. Johnson's competency, the trial court noted that the law presumes that all defendants are competent and that a defendant challenging competency has the burden of proving incompetency. The trial court further explained that although the doctors' testimony, the submitted expert reports, and the trial court's observations of Mr. Johnson may have raised some question regarding his competency, Mr. Johnson had not carried his burden of overcoming the presumption of competency. Accordingly, the trial court held that Mr. Johnson was competent to knowingly and voluntarily waive the presentation of mental health mitigation evidence.

In the penalty phase, the State presented evidence that Officer Vance was thirty years old when he was murdered and was survived by his wife, nine-year-old daughter, brother, and mother. The State also presented evidence of two statutory aggravating circumstances. First, as to Tennessee Code Annotated section 39-13-204(i)(9), Captain Timothy Eads testified that Officer Vance was a sworn officer of the Bristol Police Department and was in uniform performing his official police duties when he was killed on November 27, 2004. Secondly, as to Tennessee Code Annotated section 39-13-204(i)(2), the State introduced a certified copy of a judgment showing that Mr. Johnson had been previously convicted of the crime of malicious wounding in Virginia, "a felony whose statutory elements involve violence to the person."[6]

Defense counsel then presented its case, complying with Mr. Johnson's directive to offer only non-mental health mitigation evidence. Niki Booker, Mr. Johnson's sister, testified that Mr. Johnson was a good uncle to her children, had been present at the birth of her twins, and had been helpful to her during her pregnancy. Ms. Booker explained that Mr. Johnson had "always been there as a motivator to my children. He's been there as a role

---

[6] Mr. Johnson was convicted pursuant to Virginia Code Annotated section 18.2-51 (2010), which provides:

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

model always in a positive aspect. He continues to keep joy in our home." Ms. Booker stated that Mr. Johnson's execution would have a "tremendous effect" on her family.

Dr. Latisha Sensabaugh Walker, Mr. Johnson's cousin, testified that she grew up with Mr. Johnson and that he had been like a big brother to her. Mr. Johnson had supported her plans to become a doctor, insisted that she remain in school, and monitored her progress. Dr. Walker recalled that Mr. Johnson had expressed concern as to whether her husband "had been treating her right" after they were married.

Patty Aiello, Mr. Johnson's high school friend, testified that Mr. Johnson was a "good guy" who was "always there for you." Ms. Aiello testified that Mr. Johnson had been supportive of his friend Amanda Fields and had assumed a father-like role for Ms. Fields's daughter. Ms. Aiello admitted that she held Mr. Johnson in high regard, despite her knowledge of Mr. Johnson's previous criminal convictions. Similarly, Ms. Fields testified that Mr. Johnson has mentored her daughter from a young age after her father had abandoned their family.

The mothers of Mr. Johnson's children, Natasha Pender and Kim Delaney, also testified on Mr. Johnson's behalf. Ms. Pender, who gave birth to Mr. Johnson's child in early November 2004, testified that she would be devastated if Mr. Johnson were executed. She also testified that although Mr. Johnson had very little contact with his son before being arrested for Officer Vance's murder, Mr. Johnson sends letters and pictures to him from jail. Ms. Delaney, the mother of another one of Mr. Johnson's children, testified that Mr. Johnson was a loving father and active in her son's life. Ms. Delaney explained that she and her son visit Mr. Johnson in the jail weekly and that she believes it is important that he remain in their lives.

Defense counsel presented other witnesses who provided similar testimony. After these witnesses testified, the trial court again inquired into Mr. Johnson's desire not to present mental health mitigation evidence. Mr. Johnson confirmed his decision and the trial court held that Mr. Johnson had made a valid, voluntary, and knowing waiver of his right to present mental health mitigation evidence. Following this ruling, Mr. Johnson and his counsel rested their case.

During closing arguments, the State made the following reference to abortion:

Do you think this man is a positive role model for anyone? Much less two small children. He is an inspirational father. What is this man going to inspire his children to do? And in regards to that I would point out to you that the

man who you saw the photograph of attending the birth of the one child is also the same man who wanted to abort what turned out to be his three daughters.[7]

Defense counsel immediately objected to this comment. The trial court sustained the objection and instructed the jury to disregard the reference to abortion. Based on the cumulative prejudicial effect of this comment and a subsequent comment regarding a lack of evidence concerning Mr. Johnson's remorse, defense counsel moved for a mistrial. The trial court held that the abortion comment was improper, but that it did not warrant a mistrial because any error had been resolved by the curative instruction to the jury.

The jury returned its verdict on April 27, 2007, sentencing Mr. Johnson to death. Mr. Johnson filed a motion for judgment of acquittal, or in the alternative, for a new trial on May 23, 2007. He filed an amended motion on September 28, 2009. The trial court denied the motions on December 29, 2009. The Court of Criminal Appeals affirmed the conviction and sentence of death.

Pursuant to Tennessee Code Annotated section 39-13-206(a)(1), we granted Mr. Johnson an automatic review and now address the following issues: whether a mentally competent defendant may waive the presentation of mitigation evidence during the penalty phase of a capital trial; whether the evidence preponderates against the trial court's decision that Mr. Johnson was mentally competent; whether the trial court erred by overruling Mr. Johnson's motion for a mistrial based on the prosecutor's reference to abortion during his closing argument in the penalty phase; and whether the Tennessee death penalty statute is constitutional. Pursuant to the mandate of Tennessee Code Annotated section 39-13-206(c), we also carefully review Mr. Johnson's death sentence.

## II.

### A. Waiver of Mitigation Evidence

Mr. Johnson argues that defense counsel was required to present all relevant mitigating evidence, including mental health testimony, during the penalty phase of the trial despite his objection. Alternatively, Mr. Johnson argues that even if he could waive his right to present mitigating evidence, the trial court erred by finding him competent to make a knowing and voluntary waiver. In his motion for a new trial, Mr. Johnson also argued that the trial court should have called the mental health mitigation witnesses as its own witnesses.

---

[7] This comment referred to B.M., who after refusing to get an abortion, gave birth to triplets.

A capital defendant retains the right to make a decision about whether to present mitigation evidence during his or her trial. *Zagorski v. State*, 983 S.W.2d 654, 658 (Tenn. 1998) (citing *State v. Franklin*, 714 S.W.2d 252, 262 (Tenn. 1986)). Ultimately, "the right to a defense belongs to the defendant." *Id*. The defendant's decision to waive mitigation evidence is binding on defense counsel because the decision to waive mitigation evidence is a component of the decision to waive a jury trial, a decision left solely to the discretion of the defendant. *See State v. Kiser*, 284 S.W.3d 227, 253 (Tenn. 2009) (interpreting Tennessee Supreme Court Rule 8 regarding the decision-making process between counsel and the defendant). A defendant may waive the right to present mitigation evidence if the defendant was competent at the time and the waiver was knowing and voluntary. *Zagorski*, 983 S.W.2d at 658-59.

In order for a state's death penalty statute to pass constitutional scrutiny under the Eighth Amendment, a defendant must be afforded the right to present evidence of mitigating circumstances to the jury. U.S. Const. amend. VIII; *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); *see also State v. Dellinger*, 79 S.W.3d 458, 473-74 (Tenn. 2002) (holding that the defendant had a right to present mitigation evidence, but evidence that the defendant was a "human being" was irrelevant and could not be presented). Although a capital defendant has the right to present mitigating evidence, the defendant has no affirmative duty to do so. *See Kiser*, 284 S.W.3d at 254 (citing *State v. Cowans*, 717 N.E.2d 298, 310 (Ohio 1999)); *see also Sumner v. Shuman*, 483 U.S. 66, 76 (1987) (permitting defendant to present mitigation evidence). Rather, the decision to exercise the right to present mitigation evidence is a strategic decision encompassed in the rights to a defense and to waive a jury trial. *See Kiser*, 284 S.W.3d at 253; *Zagorski*, 983 S.W.2d at 658 ("Ultimately, the right to a defense belongs to the defendant."); *see also Faretta v. California*, 422 U.S. 806, 821 (1975) ("Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.").

Mr. Johnson relies on authority from New Jersey that holds a capital defendant cannot waive the presentation of mitigation evidence. *See* Brief for Appellant at 27, *Johnson*, No. E2010-00172-SC-DDT-DD (Tenn. June 5, 2012) (citing *State v. Hightower*, 518 A.2d 482 (N.J. Super. Ct. App. Div. 1986)). In *Hightower*, the defendant was convicted of the felony murder of a grocery store employee during the course of a robbery. *Id*. at 482. Before his sentencing hearing, the defendant ordered his counsel not to present mitigation evidence because he preferred the death penalty to serving thirty years to life in prison. *Id*. After concluding that "[i]f a jury did not hear the evidence allegedly in mitigation, it could have difficulty discharging its statutory, and indeed, moral duty," the appellate court held that the jury must hear any relevant evidence on mitigation which counsel chooses to offer. *Id*. at 483. The court further expressed its concern that the defendant's desire to waive the presentation of mitigation evidence may "eventually thwart effective proportionality review."

*Id.* at 484; *see also State v. Koedatich*, 548 A.2d 939, 994 (N.J. 1988) ("Without any evidence in the record of mitigating factors we are missing a significant portion of the evidence that enables us to determine if the imposition of death was appropriate.").

Similarly, the Supreme Court of California at one time equated a defendant's waiver of mitigation evidence in the penalty phase of a trial as "state assisted suicide" and held that the waiver undermined the state's interest in obtaining a reliable sentence. *See People v. Deere*, 710 P.2d 925, 930 (Cal. 1985), *overruled by People v. Bloom*, 774 P.2d 698, 718 (Cal. 1989). But the court reversed its holding in *Deere* and reframed the issue as being a component of a defendant's right of self-representation rather than an issue of cruel and unusual punishment. *Bloom*, 774 P.2d at 714-16. The court held that it would respect the "defendant's personal choice on the most 'fundamental' decisions in a criminal case." *Id.* at 714.

Nevertheless, some academicians insist that requiring the presentation of all mitigation evidence is the only way to ensure that the death penalty has been applied appropriately. *See*, *e.g.*, Anthony J. Casey, *Maintaining the Integrity of Death: An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings*, 30 Am. J. Crim. L. 75, 104 (2002). Moreover, other scholars opine that requiring the presentation of mitigation evidence, even if the defendant objects, furthers the public's interest in upholding the Eighth Amendment's protection against cruel and unusual punishment. *See, e.g.*, Jeffrey L. Kirchmeier, *Let's Make a Deal: Waiving the Eighth Amendment by Selecting a Cruel and Unusual Punishment*, 32 Conn. L. Rev. 615, 646-47 (2000).

However, a greater number of jurisdictions hold that a defendant may waive the presentation of mitigation evidence.[8] For example, the Delaware Supreme Court recently

---

[8] *See State v. Maestas*, 2012 UT 46, ¶ 236, ___ P.3d ___, ___, No. 20080508, 2012 WL 3176383, at *50 (Utah July 27, 2012) (citing *State v. Arguelles*, 2003 UT 1, ¶ 82, 63 P.3d 731, 752-53 (Utah 2003)); *see also, e.g.*, *Whitehead v. State*, 955 So. 2d 448, 454 (Ala. Crim. App. 2006) (permitting mitigation evidence and acknowledging Tennessee's procedure as outlined in *Zagorski* as the standard in Alabama); *State v. Joseph,* 283 P.3d 27, 31 (Ariz. 2012) (permitting waiver of mitigation evidence); *Bloom*, 774 P.2d at 714-16 (same); *Taylor v. State*, 32 A.3d 374, 389 (Del. 2011) (same); *Hojan v. State*, 3 So.3d. 1204, 1213-14 (Fla. 2009) (same); *People v. Steidl*, 685 N.E.2d 1335, 1343-44 (Ill. 1997) (recognizing that a capital defendant may waive mitigation evidence if done so knowingly and voluntarily); *Smith v. State*, 686 N.E.2d 1264, 1274-76 (Ind. 1997) (permitting waiver of mitigation evidence); *St. Claire v. Commonwealth.,* 140 S.W.3d 510, 560 (Ky. 2004) (same); *Bishop v. State*, 597 P.2d 273, 276 (Nev. 1979) (same); *Magnan v. State*, 2009 OK CR 16, ¶¶ 45-47, 207 P.3d 397, 410-11 (Okla. Crim. App. 2009) (same); *Commonwealth v. Puksar*, 951 A.2d 267, 288 (Pa. 2008) (same); *State v. Robert*, 2012 SD 60, ¶¶ 20-21, 820 N.W.2d 136, 143-44 (S.D. 2012) (same); *State v. Woods*, 23 P.3d 1046, 1072-73 (Wash. 2001) (same); Jules Epstein,

(continued...)

recognized that while *Lockett* established the defendant's right to present mitigation evidence, the Supreme Court did not hold that a defendant could not waive that same right. *Taylor*, 32 A.3d at 389. Moreover, some scholars and courts have concluded that the purpose of the presentation of mitigation evidence is not rooted in a societal interest to ensure the appropriateness of the death sentence, but rather is to protect the defendant's own interest in presenting his or her defense. *See, e.g.*, Richard J. Bonnie, *The Dignity of the Condemned,* 74 Va. L. Rev. 1363, 1383-84 (1988); *see also, e.g.*, *State v. Tyler*, 553 N.E.2d 576, 584 (Ohio 1990) (holding that mitigation evidence does not derive from a societal interest in promoting leniency or reducing the number of death sentences), *superseded on others grounds by constitutional amendment as stated in State v. Smith*, 684 N.E.2d 668, 683 n.4 (Ohio 1997).

Tennessee aligns itself with the jurisdictions that allow a capital defendant to waive the presentation of mitigation evidence. The decision of "whether to forego a legally available objective because of non-legal factors [is] for the client and not the lawyer." *State v. Smith*, 993 S.W.2d 6, 14 (Tenn. 1999). "[A]lthough [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Zagorski*, 983 S.W.2d at 658 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)). The defendant has the right to waive the presentation of mitigation evidence, even if counsel disagrees.

To ensure the validity of a defendant's waiver of mitigation evidence, trial courts should apply the three-pronged inquiry set forth in *Zagorski*. After defense counsel alerts the court, outside the presence of the jury, of the defendant's desire to waive the presentation of mitigating evidence, the trial court must:

> 1. Inform the defendant of his [or her] right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial;

[8](...continued)
*Mandatory Mitigation: An Eighth Amendment Mandate to Require Presentation of Mitigating Evidence, Even When the Sentencing Trial Defendant Wishes to Die*, 21 Temp. Pol. & Civ. Rts. L. Rev. 1, 2 (2011) ("The right to waive the presentation of mitigation evidence has virtually uniform acceptance . . . ."). *But see Morrison v. State*, 373 S.E.2d 506, 509 (Ga. 1988) (holding that a defendant's intentions are not controlling and that presentation of mitigation evidence could potentially be a constitutional requirement); *State v. Winkler*, 698 S.E.2d 596, 603 (S.C. 2010) (treating the presentation of mitigation evidence during the penalty phase of a capital trial as a tactical decision left to the attorney rather than the defendant).

2. Inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and

3. After being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she decides to forego the presentation of mitigating evidence.

*Zagorski,* 983 S.W.2d at 660. The trial court must exercise care not to inquire into the content of the evidence being waived so as to guard against the disclosure of information protected by attorney-client privilege. *Id.*

In this case, the trial court complied with both the letter and spirit of the *Zagorski* inquiry. The trial court informed Mr. Johnson of his right to present mitigation evidence and questioned him to determine whether he understood his rights and the importance of presenting mitigation evidence. The trial court called Mr. Johnson to make a special appearance to testify about his decision to waive mitigation evidence. The trial court confirmed, with both Mr. Johnson and defense counsel, that they had discussed the importance of mitigating evidence and the possible consequences of waiving the presentation of such evidence. The trial court also asked Mr. Johnson to define mitigating circumstances and describe how he envisioned the jury would factor this evidence into its decision. Finally, the trial court considered Mr. Johnson's explanation for waiving the evidence.

Following the initial inquiry, the trial court recessed overnight to allow Mr. Johnson to further contemplate his decision. The next day, the trial court confirmed that Mr. Johnson understood what he was doing and that he remained steadfast in his decision. When Mr. Johnson announced his desire to offer non-mental health mitigation evidence, the trial court again discussed with him the specific parameters of the evidence he wished to present as well as the consequences of not presenting all available mitigation evidence. The trial court reviewed Mr. Johnson's decision again following the competency evaluation.

Whether Mr. Johnson could waive the presentation of mitigation evidence is a question of law which we review de novo with no presumption of correctness. *See State v. Sexton*, 368 S.W.3d 371, 407 (Tenn. 2012) ("Questions of law . . . are subject to de novo review."). Based on our review of the record, we conclude that the trial court properly followed the procedure set forth in *Zagorski* in confirming that Mr. Johnson's waiver of his right to present mitigation evidence was knowing and voluntary. We find no error in the trial court's decision to allow Mr. Johnson to waive the presentation of mitigation evidence.

-13-

Although Mr. Johnson had the right to waive mitigation evidence, he must have been mentally competent to make the decision. *See Kiser*, 284 S.W.3d at 244. The Fourteenth Amendment to the Constitution of the United States prohibits the trial of an incompetent defendant. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). This same prohibition is embodied in article I, section 8 of the Tennessee Constitution. *See State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000). A defendant's competency to waive mitigation evidence is determined by the same standard used to determine whether a defendant is competent to stand trial. *Kiser*, 284 S.W.3d at 244.

A defendant is competent to stand trial, and thus waive the presentation of mitigation evidence, whenever he or she "has sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding—and [when] he [or she] has a rational as well as factual understanding of the proceedings." *Id.* (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also State v. Reid*, 164 S.W.3d 286, 306 (Tenn. 2005); *Mackey v. State*, 537 S.W.2d 704, 708 (Tenn. Crim. App. 1975). Specifically, a defendant is competent if he or she has "the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and assist in preparing his [or her] defense." *Reid*, 164 S.W.3d at 306 (citing *State v. Black*, 815 S.W.2d 166, 174 (Tenn. 1991)).

In Tennessee, a criminal defendant is presumed to be legally competent. *Reid,* 164 S.W.3d at 306-07; *see also State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). A defendant bears the burden of proving his or her incompetency by a preponderance of the evidence. *Reid*, 164 S.W.3d at 308; *see also Medina v. California*, 505 U.S. 437, 452 (1992) (holding that a state may place the burden of proving incompetency on the defendant). In her concurring opinion in *Medina*, Justice O'Connor explained the utility of placing this burden on the defendant:

> The main concern of the prosecution, of course, is that a defendant will feign incompetence in order to avoid trial. If the burden of proving competence rests on the government, a defendant will have less incentive to cooperate in psychiatric investigations, because an inconclusive examination will benefit the defense, not the prosecution. A defendant may also be less cooperative in making available friends or family who might have information about the defendant's mental state. States may therefore decide that a more complete picture of a defendant's competence will be obtained if the defense has the incentive to produce all the evidence in its possession. The potentially greater overall access to information provided by placing the burden of proof on the defense may outweigh the danger that, in close cases, a marginally incompetent defendant is brought to trial. Unlike the requirement of a hearing

or a psychiatric examination, placing the burden of proof on the government will not necessarily increase the reliability of the proceedings.

*Medina*, 505 U.S. at 455 (O'Connor, J., concurring).

A defendant may prove his or her incompetency with evidence of the defendant's "irrational behavior, his [or her] demeanor at trial, and any prior medical opinion on competence to stand trial." *Kiser*, 284 S.W.3d at 246 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). Although defense counsel's opinion that the defendant is incompetent is a factor the court may consider, *see Medina*, 505 U.S. at 450, the mere fact that a defendant chooses to waive mitigation evidence—or as counsel asserted in this case, that Mr. Johnson is "willing to roll over and let a jury kill him"—will not be sufficient to establish his or her incompetency. *Cf. Kiser*, 284 S.W.3d at 251 ("We reject, however, the notion that the decision to waive mitigation proof is, in and of itself, a sufficient indication of incompetency to stand trial . . . .").

Defense counsel also pointed to Mr. Johnson's beliefs that one of the jurors was a member of the Ku Klux Klan and that another was a Mason who had been sleeping during the trial as evidence of Mr. Johnson's incompetency. Additionally, they claimed that Mr. Johnson's change of mind after receiving his mother's note tended to show that he was not capable of making a decision. Mr. Johnson presented no other evidence that he was incompetent to make a knowing and voluntary waiver.[9]

During the penalty phase, the trial court ordered a competency evaluation to be conducted by Drs. William Bernet and Stephen Lawhon. The doctors estimated that an hour would be adequate time, and the trial court indicated additional time would be given if necessary. Following the evaluation, both doctors reported back to the trial court that Mr. Johnson had refused to participate. Dr. Bernet explained that he had been unable to reach a conclusion regarding Mr. Johnson's competency because Mr. Johnson had not cooperated with the evaluation. Dr. Bernet explained that lack of cooperation "could be simply a logical, well-thought-out refusal; or it could be because of some paranoid reason that the person has that might be the reason for refusal." Dr. Bernet recounted that, at times, Mr. Johnson seemed competent; for example, "he knew my name and the name of the other doctor. He knew why we were here. He knew why we were having this conversations [sic]. He

---

[9] At oral argument in this Court, defense counsel candidly admitted that there was "nothing in the course of the trial that would show [Mr. Johnson] is clearly incompetent or doesn't understand it. All the record shows he is highly intelligent . . . . Up until [the penalty phase] there was nothing to suggest he was incompetent."

understood that." However, Dr. Bernet also described behavior that suggested Mr. Johnson was not competent:

> [H]e said he didn't want to even do this because it was just a game. He got upset when I wrote that down on a piece of paper . . . . [H]e refused to even talk in a conversational manner about what the issues are. And sometimes, when people are defensive, they're being defensive for some kind of paranoid reason.

In conclusion, Dr. Bernet announced that he could not testify one way or the other as to Mr. Johnson's competency.

Next, Dr. Lawhon testified that he had been unable to reach a conclusion because the evaluation had been too brief, "not at our choosing, but because of [Mr. Johnson's] choosing." Dr. Lawhon continued:

> Mr. Johnson's a very intelligent man. He was very rational, very interesting. . . . He knew the purpose of what our evaluation was. It was to look at his competence and to look at the mitigating circumstances in this case. He knew what mitigating circumstances were. . . . He was comfortable having his mother and family testify as to those mitigating circumstances, but much less comfortable with any mental health or psychiatric or psychological testimony. He did not explain why about that.
>
> He was very alert. He kind of talked in a fast and rapid manner, but seemed to actually be somewhat unusually happy for the circumstances that we found him in.
>
> He was somewhat suspicious and guarded. He was cordial toward both of us, and pleasant. He was a little bit we would describe [sic] as being emotionally labile. In other words, something happens and it's kind of like being upset, although he wasn't upset. But it's kind of like when you're with someone . . . and you kind of have to walk on tiptoes because you know that they maybe have a—have a bad temper or having a bad day. So he was kind of—kind of like in that kind of frame of mind. But he clearly knew why he was here.
>
> It was difficult in the time frame to reach a definitive conclusion. He certainly displayed some evidence that he might be competent; but on the other hand . . . he was suspicious, guarded. And if we had a little more time I think

-16-

we could have reached a conclusion. But based—because it was so short I think we would be unfair to the Defendant if we tried to reach a conclusion at this time.

After hearing from both doctors, the trial court concluded that Mr. Johnson had not overcome the presumption of competency by a preponderance of the evidence and was therefore competent to waive the presentation of mitigation evidence. With regard to the doctors' testimony, the court explained:

In particular Dr. Lawhon was I think more descriptive and credible. Dr. Bernet, he's qualified his—the Court notes his findings were limited. And he did describe some areas that concerned him particularly in how he related the Defendant's conduct at the interview with certain things that might exist, like a mental defect or disease. But unfortunately the Court is deprived of the lack of cooperation of the Defendant.

The trial court's findings pertaining to Mr. Johnson's competency "are conclusive on appeal unless the evidence preponderates otherwise." *Reid,* 164 S.W.3d at 306 (citing *Oody*, 823 S.W.2d at 559). Our review of the record underscores the concerns Justice O'Connor enunciated in her concurrence in *Medina.* Mr. Johnson attempted to derail the trial by raising the issue of incompetency and then by refusing to comply with efforts to ascertain his competency. Mr. Johnson had the burden of proof, and he failed to overcome the presumption of competency. The mere fact that Mr. Johnson's decision to waive the presentation of certain mitigation evidence may not be wise, the best strategic decision, or the same decision defense counsel or the trial court believes is the best, does not inherently mean that Mr. Johnson is incompetent to make this decision.

The evidence supports the trial court's finding that Mr. Johnson had "the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and to assist in preparing his [or her] defense." *Reid*, 164 S.W.3d at 306 (citing *Black*, 815 S.W.2d at 174). Again, "although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Zagorski*, 983 S.W.2d at 658 (quoting *Faretta*, 422 U.S. at 834). The evidence does not preponderate against the trial court's decision that Mr. Johnson was competent. Therefore, we affirm the trial court's ruling that Mr. Johnson was competent and made a knowing and voluntary waiver of his right to present mitigation evidence.

Defense counsel argues that the trial court should have called the mental health witnesses on its own. We disagree. Although the "trial judge has discretion to call witnesses

-17-

in criminal cases," such action should be "exercised with special care and discretion in a jurisdiction like Tennessee, where a trial judge is forbidden to comment upon the evidence." *Montesi v. State*, 220 Tenn. 354, 370, 417 S.W.2d 554, 561 (1967) (citing Tenn. Const. art. 6, § 9); *see also McDonald v. State*, 89 Tenn. 161, 164, 14 S.W. 487, 488 (1890) ("It is natural that jurors should be anxious to know the mind of the court, and follow it.").

Tennessee Rule of Evidence 614(b) expressly permits the trial court to "interrogate witnesses," but Rule 614(a) admonishes that "[t]he court *may not* call witnesses except in extraordinary circumstances or except as provided for court-appointed experts in Rule 706, and all parties are entitled to cross-examine witnesses thus called." Tenn. R. Evid. 614 (emphasis added). Similarly, while Rule 706 allows the court to appoint expert witness for issues to be determined by the court, "[t]he court may not appoint expert witnesses of its own selection on issues to be tried by a jury except as provided otherwise by law." Tenn. R. Evid. 706(a). We review the trial court's decision to call witnesses under an abuse of discretion standard. *See State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993) (holding that the admissibility of expert testimony is a matter left to the discretion of the trial court and will only be overturned when the trial court has exercised that discretion arbitrarily). We find no error or abuse of discretion in the trial court's decision to decline to call the mental health witnesses on its own.

## B. Closing Argument

We now consider Mr. Johnson's argument that the trial court erred by overruling his motion for a mistrial based on the prosecutor's improper remark during closing arguments in the penalty phase. Closing arguments are of special importance to the adversarial process and function to sharpen and clarify issues that the jury must resolve. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citing *Herring v. New York*, 422 U.S. 853, 862 (1975)). This Court has long recognized that, in a criminal case, the prosecutor's closing argument has "great weight on the jury." *Knight v. State*, 190 Tenn. 326, 332, 229 S.W.2d 501, 503 (1950) (citing *Turner v. State*, 72 Tenn. 206, 210 (1879)). Accordingly, a prosecutor's closing argument must be "temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). We have recognized that, in closing arguments, it is unprofessional for a prosecutor to:

(1)     Intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

(2)     Express his or her personal belief or opinion as to the truth or falsity of any testimony or guilt of the defendant.

-18-

(3)     Use arguments calculated to inflame the passions or prejudices of the jury.

(4)     Make an argument that would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(5)     Intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*See Sexton*, 368 S.W.3d at 419 (citing *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)); *see also* American Bar Association, *Standards Relating to the Prosecution Function and the Defense Function*, §§ 5.8-5.9 (1970).

The State's reference during closing arguments in the penalty phase to Mr. Johnson's insistence that B.M. have an abortion potentially implicates two different categories of prosecutorial misconduct: that a prosecutor should not make an argument calculated to inflame the passions or prejudices of the jury and that a prosecutor should refrain from argument that would lead the jury to consider issues larger than the defendant's innocence or guilt. The trial court held that the prosecutor's statement was improper and instructed the jury to disregard it.

The mere fact that a prosecutor's closing argument was improper, however, does not necessitate a mistrial. Rather, "[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State*, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965); *accord Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." (internal quotation marks omitted)). In measuring the prejudicial impact of a prosecutor's improper statements, courts should consider:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Trial courts have significant discretion to control closing arguments, *Banks*, 271 S.W.3d at 132, and the decision to grant a motion for mistrial rests within the discretion of the trial court. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). A mistrial is an appropriate remedy whenever a "trial cannot continue or a miscarriage of justice would result if it did," *Id.*, and should be declared only upon a showing of "manifest necessity." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003); *see also Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977) (citing *Illinois v. Somerville*, 410 U.S. 458, 462-63 (1973)) ("If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared . . . ."). We refrain from disrupting a trial court's decision to grant or deny a mistrial unless the record demonstrates an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990). An abuse of discretion occurs when the trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Arguably, the State's reference to abortion was improper, but any prejudicial impact that argument had on the jury was minimal given the overwhelming proof in the State's favor. *Cf. State v. Cauthern*, 967 S.W.2d 726, 736-38 (Tenn. 1998) (holding that a prosecutor's patently improper argument, using the lyrics of The Rolling Stones's hit song "Sympathy for the Devil" to compare the defendant to "the evil one" was not prejudicial even in the absence of curative instructions from the trial court in light of the evidence presented). The issue of abortion was already properly before the jury. The prosecutor was not arguing extraneous information lacking in evidentiary support, but rather was placing emphasis on a fact already established by evidence in attempt to rebut the claim that Mr. Johnson was a good father and role model. Additionally, the trial court's immediate curative instruction to the jury was sufficient to rectify any remaining prejudice, and this Court presumes that the jury follows the trial court's instructions. *Compare State v. Smith*, 639 S.W.2d 677, 681 (Tenn. Crim. App. 1982), *and State v. Barton*, 626 S.W.2d 296, 298 (Tenn. Crim. App. 1981), *with Blakenship v. State*, 219 Tenn. 335, 359, 410 S.W.2d 159, 160-61 (1966) (A mistrial will not be declared if the court instructs the jury to disregard prejudicial evidence "unless real doubt is raised as to whether the judicial warning against its consideration was effective."). The trial court did not abuse its discretion by overruling Mr. Johnson's motion for a mistrial.

### C. Constitutionality of the Death Penalty Statute

Mr. Johnson next asserts that the trial court erred in denying his motion to dismiss the indictment based on his argument that the Tennessee death penalty statute is unconstitutional. Mr. Johnson concedes that this Court has previously upheld the death

penalty statute. But, he maintains that the language of Tennessee Code Annotated section 39-13-204(g)(1), requiring the imposition of death if the jury finds both that the State has proven the existence of at least one statutory aggravating circumstance and that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, constitutes an unconstitutional legislative usurpation of the jury's constitutional right to determine the law and facts of the case. According to Mr. Johnson, because the statute directs that the jury "shall impose" a sentence of death if it determines that the aggravating circumstances outweigh mitigating circumstances, the statute "blurs" the legislative and adjudicative functions and shifts the ultimate decision-making authority from the jurors to legislators who know nothing about the case.

The State relies on this Court's prior holdings that the Tennessee death penalty statute is constitutional. The State argues that the Tennessee death penalty statute does not result in an usurpation of the jury's responsibilities and power; rather the statute is a codification of the common law retaining the legislature's authority to determine sentencing procedure and guidelines.

We agree with the State. Mr. Johnson's argument runs counter to the historical context of this constitutional provision and this Court's prior holdings. The Tennessee Constitution provides that "in all indictments for libel, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases." Tenn. Const. art. 1, §19. However, this constitutional language was intended to be a declaration of a jury's rights and responsibilities as they existed at common law. *See Black*, 815 S.W.2d at 185-87. At common law, the jury only maintained the right and responsibility to act under the instructions of the court and apply the law given to them to the facts proven with the mission of determining guilt. *Id.* at 186 (citing *Harris v. State*, 75 Tenn. 538, 547-48 (Tenn. 1881)). Although the exact role of the jury at common law is unclear and subject to some debate among scholars, it is well settled that "[t]he right to have the jury assess the punishment was not a part of the right of trial by jury . . . ." *Woods v. State*, 130 Tenn. 100, 107, 169 S.W. 558, 559 (1914). Rather, "[t]he power to declare what shall be the appropriate punishment for an ascertained crime belongs solely to the Legislature." *Id.*

The legislature is permitted to, and frequently does, delegate its duty to determine the appropriate sentence. *Black,* 815 S.W.2d at 187. In doing so, the legislature may also provide strictures or afford various levels of guided discretion. *Id.* at 187 (citing *State v. Latham*, 136 Tenn. 30, 38, 188 S.W. 534, 536 (1916); *Woods*, 130 Tenn. at 107, 169 S.W. at 559). In capital sentencing cases, the General Assembly has charged the jury with determining whether a capital defendant should be put to death by requiring the jury to consider the existence of aggravating circumstances and whether those aggravating circumstances outweigh any mitigating circumstances. *See* Tenn. Code Ann. § 39-13-204(g).

Pursuant to the General Assembly's instructions, the jury must impose the death penalty only if it concludes, after a review of all the evidence presented, that at least one statutory aggravating circumstance has been proven beyond a reasonable doubt and outweighs the mitigating circumstances of the case beyond a reasonable doubt. *Id.* With this charge, the General Assembly has validly exercised its right to delegate a sentencing determination to the jury and has provided what it considers to be an appropriate level of discretion. Accordingly, this statutory scheme is consistent with the traditional function of the jury and fully satisfies article 1, section 19 of the Tennessee Constitution. We reaffirm our prior holdings that the Tennessee death penalty statute is constitutional.

## IV. Mandatory Review

This Court is statutorily required to conduct a review of a sentence imposing the penalty of death on a defendant. Tenn. Code Ann. § 39-13-206(a)(1). We are required to review every sentence of death and determine whether:

(1)  it was imposed in an arbitrary fashion;
(2)  the evidence supports the jury's findings of aggravating circumstances;
(3)  the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and
(4)  the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

*See* Tenn. Code Ann. § 39-13-206(c)(1).

The Eighth and Fourteenth Amendments to the United States Constitution "cannot tolerate the infliction of a sentence of death under legal systems that permit [it] to be so wantonly and so freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring); *see also* U.S. Const. amends. VIII & XIV. However, "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg v. Georgia*, 428 U.S. 153, 195 (1976); *see also Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) ("[A state] must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" (internal citations omitted)). We have consistently held that Tennessee's capital punishment procedure satisfies these constitutional requirements. *See Kiser*, 284 S.W.3d at 271; *State v. Shepherd*, 902 S.W.2d 895, 907 (Tenn. 1995) (citing *Black*, 815 S.W.2d at 185). Our review of the record confirms that the trial court conducted Mr. Johnson's trial consistent

with relevant constitutional and statutory provisions, the Tennessee Rules of Criminal Procedure, and this Court's precedent interpreting these authorities. We hold that Mr. Johnson's sentence of death was not imposed in an arbitrary manner.

We next turn to the issue of whether the State proved, beyond a reasonable doubt, the existence of at least one statutorily defined aggravating circumstance as required by Tennessee Code Annotated section 39-13-206(c)(1)(B). Based on the State's proof, the jury found there was enough evidence to conclude, beyond a reasonable doubt, the existence of two statutory aggravating circumstances: (1) that the murder was committed against a law enforcement officer who was engaged in the performance of his official duties and that Mr. Johnson knew that the victim was a law enforcement officer who was engaged in the performance of official duties and (2) that Mr. Johnson had been previously convicted of a felony "whose statutory elements involve the use of violence to the person." *See* Tenn. Code Ann. § 39-13-204(i)(2), (9).

We review the evidence in the light most favorable to the State to determine whether a rational juror could have found the existence of the aggravating circumstances beyond a reasonable doubt. *See State v. Rimmer*, 250 S.W.3d 12, 33 (Tenn. 2008); Tenn. Code Ann. § 39-13-206(c)(1)(B). We find that the State's proof in this case was thorough, concise, and essentially unrefuted. First, the State called Captain Timothy Eads with the Bristol Police Department who testified that on November 27, 2004, Officer Vance was on duty with the Bristol Police Department when he was dispatched to the Mitchell residence. Trial testimony established that Officer Vance was in his uniform, arrived at the Mitchell house in a patrol car, and identified himself as a police officer. Mr. Johnson knew or should have known that Officer Vance was a police officer. Second, the State provided a certified record from Virginia establishing that Mr. Johnson previously had been convicted of malicious wounding, which is a felony involving violence to the person. We find that the evidence was more than sufficient to establish both aggravating circumstances beyond a reasonable doubt.

We must also determine whether the evidence supports the jury's view that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt as required by Tennessee Code Annotated section 39-13-206(c)(1)(C). The jury heard testimony about Mr. Johnson's background and social relationships. Witnesses testified that Mr. Johnson was caring, supportive, and well-intentioned. Some witnesses also testified that Mr. Johnson's execution would adversely affect their lives. The jury reasonably concluded based on the evidence presented that any mitigating circumstances were outweighed by the evidence of the aggravating circumstances beyond a reasonable doubt. We hold that the evidence presented at trial was sufficient to allow a reasonable jury to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

-23-

Finally, we review the sentence of death to determine whether the imposition of the death penalty in this case is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). Our comparative proportionality review is distinct from a traditional Eighth Amendment review, which is the "abstract evaluation of the appropriateness of a sentence for a particular crime." *State v. Bland*, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting *Pulley v. Harris*, 465 U.S. 37, 42-43 (1984)); *see also* U.S. Const. amend. VIII. In *Pulley*, the Supreme Court of the United States recognized that the death penalty is not inherently disproportionate for first degree murder cases. 465 U.S. at 43. Rather, the Court recognized that comparative proportionality review begins with the presumption that the death penalty does not constitute cruel and unusual punishment under the Eighth Amendment and asks whether the imposition of the death penalty is "nonetheless unacceptable in a particular case because [it is] disproportionate to punishment imposed on others convicted of the same crime." *Id.*; *see also State v. Hall*, 976 S.W.2d 121, 135 (Tenn. 1998) ("In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder."). We recognize that our mission is "not to search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and invalidate the aberrant death sentence." *Bland*, 958 S.W.2d at 665 (citing *State v. Kandies*, 467 S.E.2d 67, 86 (N.C. 1996); *State v. Groseclose*, 615 S.W.2d 142, 150 (Tenn. 1981)).

We must invalidate a death sentence whenever it is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." *Bland*, 958 S.W.2d at 665 (citing *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. 1993) (en banc)). This Court need not identify a previous case in which the death penalty was imposed under the exact circumstances of the case under review. In the same way, "[e]ven if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence." *Bland*, 958 S.W.2d at 665 (citing *State v. Carter*, 714 S.W.2d 241, 251 (Tenn. 1986)); *see also Gregg*, 428 U.S. at 203 (holding that "the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk or arbitrariness or caprice."); *Hall*, 976 S.W.2d at 135 ("A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence."). In evaluating whether a death sentence is disproportionate, our practice has been to include in the "pool" comparison cases in which a capital sentencing hearing has been conducted to determine whether a defendant should be sentenced to death, life imprisonment without the possibility of parole, or life imprisonment. *Bland*, 958 S.W.2d at 666. No case or defendant is exactly the same. *State v. Harris*, 839 S.W.2d 54, 77 (Tenn. 1992). Choosing

similar cases for comparison is not an exact science, and we consider many variables in selecting which cases to consider. *Bland*, 958 S.W.2d at 666. Such factors include:

> (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims.

*Id.* at 666 (citing *State v. Barber*, 753 S.W.2d 659, 665 (Tenn. 1988)). We also consider relevant characteristics of the defendant, which include:

> (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of the victim(s); [and] (8) the defendant's capacity for rehabilitation.

*Id.* at 667. Finally, we may also rely on our own judgment and intuition in assessing the proportionality of the death sentence in this case. *Bland*, 958 S.W.2d at 668.

Our review of the evidence indicates that Mr. Johnson arrived at the Mitchell house with two guns, vowing to kill the police or Mr. Mitchell. B.M. testified that, Mr. Johnson claimed he brought the guns to the house to "shoot [her] daddy." When B.M. told Mr. Johnson the police were on the way, he responded by saying that "[t]he police can't dodge these shells." Officer Vance was dispatched to the home after Mr. Mitchell called 9-1-1. During the course of his official duties, Officer Vance went inside the home to ensure that there were no safety concerns. Mr. Johnson, hiding in the upstairs hallway, shot and killed Officer Vance. There was no provocation or exchange of words between them. Officer Vance's gun was still in its holster. Following the shooting, Mr. Johnson admitted killing Officer Vance, laughed about what he had done, and showed no remorse. At the time of the killing, Mr. Johnson was twenty-eight years old, unmarried, and the father of two children. Mr. Johnson had a criminal record, including a previous conviction for a violent felony in Virginia. Officer Vance was a police officer engaged in official police duties when he was killed. He was thirty years old and was survived by his wife, nine-year-old daughter, mother, and brother.

Our review of similar cases in which a capital sentencing hearing was conducted has revealed the following four cases to be most pertinent to our analysis. Defendant Marlon Kiser was convicted of first degree murder and sentenced to death for the September 2001 murder of Hamilton County Deputy Sheriff Donald Bond. *See Kiser*, 284 S.W.3d at 234. Kiser had planned to set fire to a fruit stand because he believed the owner of that fruit stand had burned a fruit stand owned by Kiser's friend. *Id.* at 235. Kiser hid behind a truck when Deputy Bond arrived at the scene. *Id.* at 235-37. As Deputy Bond walked past, Kiser jumped out and shot him with an assault rifle. *Id.* at 239-41. Kiser then stole Deputy Bond's bullet-proof vest and gun and fled the scene. At trial, Kiser declined to offer any mitigating evidence in his own defense. *Id.* at 241. The jury convicted Kiser and found the presence of a single aggravating circumstance, that the murder was committed against a law enforcement officer engaged in the performance of his official duties, and that the defendant knew or should have known this. *Id.* This Court upheld Kiser's conviction and sentence of death. *Id.* at 276.

Similarly, defendant Richard Hale Austin was convicted of first degree murder and sentenced to death for the 1977 shooting of undercover officer Julian Watkins of the Memphis Police Department. *State v. Austin*, 87 S.W.3d 447 (Tenn. 2002). Angry at Officer Watkins for unveiling an illegal gambling operation, Austin made overt threats against Officer Watkins' life. Officer Watkins was killed after Austin paid two men $980 to murder him. *Id.* at 456-57. Austin's death sentence was predicated on the statutory aggravating circumstance relating to murder-for-hire. *Id.* at 458; *see also* Tenn. Code Ann. § 39-13-204(i)(4) (Supp. 1997). This case is relevant to our analysis because Austin arranged the execution-style murder of an undercover police officer. The killing was premeditated and retaliatory in nature. This Court upheld Austin's conviction and sentence of death. *Id.* at 467.

Defendant Kenneth Henderson was convicted of first degree murder and sentenced to death for the 1997 shooting of Deputy Tommy Bishop of the Fayette County Sheriff's Office. *State v. Henderson*, 24 S.W.3d 307 (Tenn. 2000). Henderson, incarcerated at the time for felony escape and aggravated battery, planned to escape while being transported to a dentist's office. *Id.* at 310. During the transport, Henderson carried a concealed .380 semi-automatic pistol that his girlfriend had smuggled into the jail for him. *Id.* Henderson pulled the gun on the dentist and shot Deputy Bishop when he rushed in to help. *Id.* When the first shot did not kill Deputy Bishop, Henderson fired a second, fatal shot to the back of Deputy Bishop's head as Henderson fled the treatment room. *Id.* Henderson was later apprehended following a police chase. *Id.* at 310-11. This Court upheld Henderson's conviction and sentence of death. *Id.* at 319.

-26-

Defendant Philip Workman was convicted of first degree murder and sentenced to death for the 1981 shooting of Lt. Ronald Oliver of the Memphis Police Department. *State v. Workman*, 667 S.W.2d 44 (Tenn. 1984). Workman had purchased food shortly before closing time at a fast food restaurant. *Id.* at 46. After the restaurant closed, Workman used a gun to force the employees into the manager's office, where he demanded money, stole a set of car keys, and threatened the employees not to follow him. *Id.* However, one of the employees managed to activate a silent alarm, and Workman encountered the police as he left the restaurant. Lt. Oliver and another officer grabbed Workman, who struggled and fired shots at the officers. *Id.* Lt. Oliver was fatally shot in the chest. *Id.* at 46-47. Workman fled the scene but was later apprehended. *Id.* This Court upheld Workman's conviction and sentence of death.[10] *Id.* at 52.

In light of these cases and considering the nature of the crime and the characteristics of the defendant, we hold that Mr. Johnson's death sentence was neither excessive nor disproportionate to the penalty imposed in similar cases and should therefore be affirmed.

**Conclusion**

We affirm the judgment of the Court of Criminal Appeals and Mr. Johnson's conviction and death sentence. Mr. Johnson's sentence of death shall be carried out on April 22, 2014, unless otherwise ordered by this Court or other proper authority. It appearing that Mr. Johnson is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
SHARON G. LEE, JUSTICE

---

[10] Philip Workman was executed on May 9, 2007.