# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
April 14, 2015 Session

## STATE OF TENNESSEE v. JEREMY SIMS AND SHERRY BROOKSHIRE

### Appeal from the Criminal Court for Shelby County
### No. 11-06350     James C. Beasley, Jr., Judge

---

### No. W2013-01253-CCA-R3-CD  -  Filed September 25, 2015

---

The defendants, Jeremy Sims and Sherry Brookshire, appeal their Shelby County Criminal Court jury convictions of kidnapping and aggravated robbery. Defendant Sims claims that the trial court abused its discretion by denying his motion for severance, the trial court erred by admitting certain witness testimony, the evidence was insufficient to sustain his conviction of aggravated robbery, the trial court erred by giving certain instructions to and communicating ex parte with the jury, the trial court erred by denying his post-trial motion for a mistrial and severance of defendants on the basis of Defendant Brookshire's incompetence to stand trial, and the cumulative effect of these errors prevented him from receiving a fair trial. Defendant Brookshire also challenges the trial court's denial of the motion to sever, the admission of certain evidence, the sufficiency of the evidence pertaining to the conviction of aggravated robbery, the trial court's instructions to the jury, and the trial court's finding that she was competent to stand trial. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. THOMAS T. WOODALL, P.J., filed a separate concurring opinion.

Neil Umsted (on appeal and at trial), and Justin Gee (at trial), Memphis, Tennessee, for the appellant, Jeremy Sims.

Vicki M. Carriker (on appeal), Memphis, Tennessee; and Lawrence Russell White and Brooke Hyman (at trial), Assistant District Public Defenders, for the appellant, Sherry Brookshire.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Fleming and Kate Edmands, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In October 2011, the Shelby County Criminal Court grand jury charged the defendants with the especially aggravated kidnapping and aggravated robbery of David Mays. The trial court conducted a jury trial in February 2013.

The State's proof at trial showed that David Mays[1] had allowed Defendant Sims to live in a spare room in his residence in exchange for Defendant Sims's performing home repairs for Mr. Mays. Although Defendant Sims had lived with Mr. Mays "off and on" for approximately two years, Defendant Sims had moved out by April 2011.

On April 4, 2011, Mr. Mays was awakened in the night by the voices of Defendant Sims "and a female" and "feet on the steps coming up the stairway." Mr. Mays immediately called 9-1-1 and did not leave his bedroom "until the police arrived." While inspecting the house with police officers, Mr. Mays noticed that a window in his downstairs study had been broken and that a walrus tusk that had been displayed on the table in front of the window was missing. Mr. Mays estimated the walrus tusk to be approximately 24 inches long and "not quite as heavy as a baseball bat." Mr. Mays then located the walrus tusk upstairs; it had been moved to a piano bench just outside Mr. Mays's bedroom. Concerned about the break-in, Mr. Mays hid his wallet, checkbook, and car keys inside a chest of drawers and covered the broken window until he "had a chance to repair" it.

In the early morning hours of April 7, Mr. Mays was again awakened by a noise in his home. Mr. Mays got out of bed, and as he was retrieving his cellular telephone to call 9-1-1, he encountered Defendant Sims. Defendant Sims grabbed the telephone out of Mr. Mays's hand and, using the handcuffs from the table by Mr. Mays's bed, Defendant Sims handcuffed Mr. Mays's hands behind his back.[2] Defendant Sims demanded to know the location of Mr. Mays's money. About this time, Defendant Brookshire appeared and joined in Defendant Sims's demand for money. Defendant Sims began rifling through Mr. Mays's chest of drawers while, a few feet away, Defendant Brookshire began beating Mr. Mays with the walrus tusk, striking him in the head, the ribs, and the legs. At some point, Mr. Mays felt four hands grab him and pull

---

[1] Based on the later testimony at trial of Defendant Sims, it appears that Mr. Mays's middle name is Bruce.

[2] Mr. Mays was employed by the Hardeman County Correctional Facility.

him into the bedroom closet, and the defendants placed a sweatshirt over Mr. Mays's head. The defendants continued to demand to know the location of Mr. Mays's money. Fearing that the defendants would beat him to death, Mr. Mays eventually told them that if they would take him out of the closet, he would give them the money.

The defendants then removed the handcuffs, and Mr. Mays retrieved his wallet from the chest of drawers. Mr. Mays attempted to hand the defendants only the cash from his wallet, but Defendant Sims insisted on taking the wallet, checkbook, car keys, and cellular telephone as well. The defendants then informed Mr. Mays that they would release him if he "would write a note or something to the effect that [he had] propositioned [Defendant Sims] for sex," and Mr. Mays complied. [3] The defendants then fled from the residence in Mr. Mays's white Jaguar sedan.

Mr. Mays waited a few minutes and then ran to his neighbors' house to call 9-1-1. Through Mr. Mays's testimony, the State introduced into evidence multiple photographs, including ones depicting the injuries to Mr. Mays's leg and head. The State also introduced into evidence the photographic line-up that Mr. Mays viewed on April 7, 2011, and on which he had circled Defendant Sims's photograph and written, "This is the man who broke into my house. He beat and robbed me. He stole my cell phone, checkbook and car."

On cross-examination, Mr. Mays acknowledged that Defendant Sims attempted to intervene during his beating at the hands of Defendant Brookshire, although Mr. Mays clarified that Defendant Brookshire had struck him "several times" before Defendant Sims asked her to stop. With respect to Defendant Brookshire, Mr. Mays stated that he thought he had only met her once prior to the home invasion and that he only knew her first name. Mr. Mays conceded that he was unable to identify Defendant Brookshire from a photographic lineup. Mr. Mays denied having any narcotics in the house, but he did acknowledge having engaged in sexual intercourse with Defendant Sims on one occasion while Defendant Sims was residing in his house.

Memphis Police Department ("MPD") Officer Demar Wells with the crime scene investigation unit testified that he responded to a call of a burglary and assault at Mr. Mays's residence. Based on his investigation, Officer Wells attempted to locate the walrus tusk that had allegedly been used to assault Mr. Mays, but he was unable to find it. Through Officer Wells's testimony, the State introduced into evidence a photograph depicting a knife and a blue knit cap located outside of Mr. Mays's residence near the broken window.

---

[3] During his direct examination, Mr. Mays confirmed that he was homosexual.

- 3 -

MPD Officer Malcolm Smith testified that, following the call of the home invasion on April 7, he received information that the suspects were "Jeremy Sims" and a woman who had a street name of "Shay." After learning where the two lived, Officer Smith set up surveillance and located Defendant Sims on April 8. Officer Smith testified that Defendant Sims fled from police officers and hid underneath a house, forcing officers to crawl under the house to apprehend him. Officer Smith located Defendant Brookshire a short time later. Although Defendant Brookshire initially gave Officer Smith a false name, she eventually admitted that her first name was Sherry. When Officer Smith asked Defendant Brookshire if she knew why he was there, Defendant Brookshire responded "that the car was in the 900 block of James Street." Officer Smith placed Defendant Brookshire under arrest, and other officers located Mr. Mays's missing Jaguar in the 900 block of James Street.

MPD Officer Richard Hillyard testified that he arrived at a residence at 2645 Whitman after officers had received consent to search the premises. At the residence, officers located a cellular telephone and two sets of keys.

MPD Sergeant John Simpson testified that he was the case officer assigned to Mr. Mays's case and that it took Mr. Mays "[s]econds" to identify Defendant Sims in the photographic lineup. After Defendant Sims was arrested, Sergeant Simpson provided him with *Miranda* warnings. Defendant Sims signed a waiver of his rights and proceeded to give a written confession to Sergeant Simpson, in which Defendant Sims stated, in part, as follows[4]:

> Walked to his house on Trezevant, I had a key and I know the alarm code because I used to live there, then I went upstairs and he was sleeping and I told him to give me some money. He told me he was not going to give me any money and I told him that he was that I needed some money. He grabbed his phone and I grabbed his arm and put it behind his back and handcuffed him. I started to look in the bathroom for money. I came back in there and he was hollering my name so I commenced to looking some more. Then I came back in he was hollering for me and told me that he would give me some money if I took the shirt off his head. So I took the shirt and handcuffs off. So, I went to the bathroom and looked under the sink in the vanity and in the closet and did not find anything. I came back in there and he told me he would give me the money if I would just leave. He told me that he would

---

[4] The version of Defendant Sims's statement admitted during the State's case in chief was redacted prior to trial to remove references implicating Defendant Brookshire in the offenses.

write me something that he gave me the money if I would just leave. He wrote me a note to me that he gave me the money voluntarily and that he tried to proposition me and signed it. He took me to a drawer in his bedroom and gave me some money and the keys and asked me not to take his phone. I took the phone anyway and I told him that I would bring it all back to him. I locked the door behind me, took the car to some side street off Bellevue.

In response to Sergeant Simpson's query of why he participated in the robbery, Defendant Sims responded that he "wanted some money for drugs and to eat."

When Sergeant Simpson finished taking Defendant Sims's statement, he interviewed Defendant Brookshire. Sergeant Simpson provided Defendant Brookshire with her *Miranda* warnings, and Defendant Brookshire executed a written waiver of her rights, after which she gave a written statement. In response to Sergeant Simpson's question of whether she had participated in the robbery of Mr. Mays, Defendant Brookshire responded that she had not, stating that she "crawled through the window when [she] heard yelling to see what was happening." Defendant Brookshire admitted taking medication from Mr. Mays's house, stating that "[i]t was Adderall and some Clomopins." She described the events surrounding the home invasion as follows:

I was standing outside for about five minutes and I crawled through the window and went upstairs. I saw some pills and I took them, I was not thinking about anything else. I had what I wanted and got into Bruce's car[,] left[,] and I don't know where because I was drinking and taking pills and I don't remember where. I remember waking up the next morning at some dude's house.

On cross-examination, Sergeant Simpson admitted that, although Defendant Sims stated that he saw Mr. Mays in the closet, Defendant Sims never stated that he placed Mr. Mays in the closet. Sergeant Simpson also conceded that Defendant Sims mentioned that he had seen the walrus tusk but that Defendant Sims neither stated that he used the walrus tusk in any way, nor admitted to placing a shirt over Mr. Mays's head. Sergeant Simpson acknowledged that he waited one day to conduct the interview of Defendant Brookshire because at the time of her arrest she "was intoxicated and high on drugs."

With this evidence, the State rested. Following the trial court's denial of both defendants' motions for judgments of acquittal and *Momon* colloquies, both defendants elected to testify.

Defendant Sims admitted that, in 2008, he had pleaded guilty to four counts of theft of property valued at $500 or less and that, in 2010, he had pleaded guilty to two counts of theft of property valued at $1,000 or more but less than $10,000 and one count of burglary. Defendant Sims testified that, "around 2009," he was introduced to Mr. Mays through a mutual friend who thought Defendant Sims might be interested in performing some house repairs for Mr. Mays. Because Mr. Mays had a room available at his residence, he permitted Defendant Sims to move into his house.

While Defendant Sims was living with Mr. Mays, Defendant Sims met Defendant Brookshire, and, at some point in time, Defendant Sims became involved in a sexual relationship with Defendant Brookshire. Defendant Sims confirmed that Defendant Brookshire had visited him at Mr. Mays's house on prior occasions, and he estimated that Defendant Brookshire had met Mr. Mays on at least two occasions.

Defendant Sims denied that he was homosexual but admitted that Mr. Mays had once performed fellatio on him while Defendant Sims was intoxicated and that Defendant Sims had attempted to engage in sexual intercourse with Mr. Mays but that he "could not perform." Defendant Sims stated that Mr. Mays would "openly flirt" with him on a daily basis while he lived with Mr. Mays and that, when Mr. Mays once flirted with him in front of others, Defendant Sims told him to stop. Defendant Sims explained that he stayed because he had nowhere else to go and because Mr. Mays funded a lifestyle for Defendant Sims that he had never previously known.

Defendant Sims testified that, while living with Mr. Mays, he installed sheetrock, prepared a slate floor, painted the exterior, caulked and repaired windows, ran water lines, installed an exterior gazebo, and measured and prepared for the installation of new cabinets. Defendant Sims explained that his agreement with Mr. Mays "was that I would live there [and] would not need for money or nothing and that he would also compensate me with money."

At some point, Mr. Mays stopped paying Defendant Sims. According to Defendant Sims, Mr. Mays consumed alcohol and took medication every day, which would affect his memory. Defendant Sims recalled that Mr. Mays took, among other things, Adderall and Klonopin. A few months prior to the home invasion, Defendant Sims moved out. Because he had nowhere to go, he and Defendant Brookshire were homeless. Defendant Sims admitted that he was addicted to "[c]ocaine, crack, pills, [and] alcohol" during this time.

Defendant Sims conceded that, sometime prior to April 4, 2011, he had used a steak knife to remove the caulk around a window in Mr. Mays's residence and to cut the piece of wood that connected two panes of glass. Defendant Sims entered Mr. Mays's house through the broken window. After disarming the security system, Defendant Sims opened a side door to allow Defendant Brookshire to enter the house. Defendant Sims denied seeing Defendant Brookshire holding a walrus tusk that night. On that occasion, Defendant Sims stole a 54-inch television from the residence.

In the early morning hours of April 7, Defendant Sims and Defendant Brookshire walked to Mr. Mays's residence. When they arrived, Defendant Sims instructed Defendant Brookshire to wait outside. He entered through the broken window and slowly made his way upstairs to Mr. Mays's room. As soon as he entered the room, Defendant Sims heard a noise at the bottom of the stairs, which awakened Mr. Mays. Defendant Sims grabbed Mr. Mays's arm when Mr. Mays picked up his telephone, and Defendant Sims began to demand money. Suddenly, Defendant Sims noticed Defendant Brookshire standing nearby. Defendant Sims instructed Defendant Brookshire to hold Mr. Mays's arm, and Defendant Sims handcuffed Mr. Mays's hands behind his back. Defendant Sims rummaged through the dresser drawers searching for money and then entered the adjacent bathroom, where he grabbed pill bottles containing Adderall and Klonopin. When he reentered Mr. Mays's bedroom, he saw Defendant Brookshire strike Mr. Mays on the leg with the walrus tusk and heard Mr. Mays yelling for him. Defendant Brookshire was calling Mr. Mays a "[p]unk m***** f*****" and "[f]a***t." Defendant Sims "immediately grabbed the tusk from her" and placed it along with the pill bottles on Mr. Mays's dresser.

Defendant Sims demanded to know why Defendant Brookshire had struck Mr. Mays, stating, "He's handcuffed. He's old." Defendant Sims recalled that Defendant Brookshire appeared to be hurt and looked at Defendant Sims "like [he was] doing something wrong." Defendant Sims saw Defendant Brookshire stand near the pill bottles while he walked downstairs to search for money. As he started back upstairs, Defendant Sims heard Mr. Mays "hollering my name but it sounded like he was far away." When Defendant Sims entered the bedroom, he saw Defendant Brookshire taking pills from the pill bottles, and he noticed two chairs were propped against the closet door. Defendant Sims "freaked out," pushed the chairs away, and opened the closet door. Defendant Sims removed the handcuffs and the shirt that was covering Mr. Mays's face. Mr. Mays told Defendant Sims that he would give him the money if he would "just get the 'F' out of here and take that crazy b**** with" him.

Mr. Mays then retrieved a box from the dresser which contained his wallet, keys, and checkbook. Defendant Sims took the box and demanded that Mr. Mays write a

letter "saying that he gave me the money and that he propositioned me." Defendant Sims was unsure of the exact amount, but he estimated that he got at least $100 in cash from Mr. Mays. Defendant Sims conceded that any amount over $100 went to Defendant Brookshire. Defendant Sims ran downstairs behind Defendant Brookshire. Defendant Sims "guess[ed]" that Defendant Brookshire crawled through the window, and Defendant Sims exited through the front door, locking it behind him. Defendant Brookshire suddenly appeared and jumped into Mr. Mays's car with Defendant Sims.

Defendant Sims testified that he intended to return the car after he purchased "some crack" but that when he returned, he saw lights from police cars and decided to "ditch" the car. Defendant Sims did not recall where he left the vehicle. He stated that Defendant Brookshire directed him to a street with which he was unfamiliar.

Defendant Sims denied placing Mr. Mays inside the closet and denied knowing that Defendant Brookshire intended to hit Mr. Mays with the walrus tusk. Defendant Sims testified that the plan was "to go in and get some money from" Mr. Mays so that Defendant Sims could "get some alcohol out [of] the bar and get some pills." Defendant Sims testified that he "would never hurt [Mr. Mays] or actually allow him to be hurt if [he] could stop it."

Following a hearing out of the presence of the jury, the trial court allowed Defendant Sims to introduce the entire, unredacted statement that he provided to Sergeant Simpson prior to trial. That statement, which inculpated Defendant Brookshire in the use of the walrus tusk to beat Mr. Mays, was substantially the same as the defendant's testimony at trial.

Defendant Brookshire testified that on the evening of April 6, Defendant Sims insisted that she accompany him to Mr. Mays's house. Defendant Brookshire did not want to go. Eventually, Defendant Sims convinced her to go to the liquor store with him, and, while en route, Defendant Sims told Defendant Brookshire that they would stop by Mr. Mays's residence to "get some money" which Defendant Sims would use to purchase drugs for Defendant Brookshire. Defendant Brookshire agreed.

When they arrived at Mr. Mays's house, Defendant Sims entered through a window and instructed Defendant Brookshire to wait for him. Defendant Brookshire intended to leave, but she heard Mr. Mays yelling and entered the house through the broken window. She ran upstairs and found Mr. Mays sitting on the bed with his hands cuffed behind his back. Defendant Brookshire told Defendant Sims to remove the handcuffs, and Defendant Sims told her to search for the key while he smoked "a crack pipe." While attempting to assist Mr. Mays in lying down on the floor, she slipped, and Mr. Mays hit his head on the dresser. Defendant Brookshire found and ingested some of

Mr. Mays's pills, and Defendant Sims ordered her to leave. As Defendant Brookshire was leaving, Defendant Sims yelled for her to come back. Defendant Brookshire picked up the walrus tusk – which she insisted was "heavier than a damn baseball bat" – from a table outside Mr. Mays's bedroom, intending to hit Defendant Sims with it. When she entered the bedroom, she tripped and dropped the tusk on Mr. Mays's leg. Defendant Brookshire apologized to Mr. Mays and asked if he was alright.

Defendant Sims demanded that Mr. Mays write a letter stating that he had propositioned Defendant Sims for sex. After Mr. Mays wrote the letter, Defendant Sims ordered Mr. Mays into the closet and told him to stay there until Defendant Sims and Defendant Brookshire had left. As Defendant Brookshire was helping Mr. Mays sit down in the closet, Mr. Mays hit his head, and a shirt from the closet fell on top of Mr. Mays's head. As the defendants fled from the house, Defendant Sims demanded that Defendant Brookshire take the walrus tusk with her. The two then drove away in Mr. Mays's vehicle.

Defendant Brookshire denied receiving anything from the robbery other than pills. Defendant Brookshire admitted that, in 2012, she had been convicted of two counts of felony forgery; that she was convicted of fraudulent use of a credit card in 2006; that she was convicted of domestic assault in 2005; and that she was twice convicted of assault in 2004 arising out of two separate incidents.

Based on this evidence, the jury convicted both defendants of the charged offense of aggravated robbery and the lesser included offense of kidnapping. Following a sentencing hearing, the trial court sentenced Defendant Sims as a standard offender to a term of four years' incarceration to be served at 30 percent for the kidnapping conviction and to be served concurrently with the term of 11 years to be served at 85 percent that the court imposed for the aggravated robbery conviction, for a total effective sentence of 11 years. With respect to Defendant Brookshire, the trial court imposed a sentence of four years as a standard offender for the kidnapping conviction, to be served concurrently with the sentence of nine years at 85 percent service the court imposed for the aggravated robbery conviction, for a total effective sentence of nine years.

Following the denial of their timely motions for new trial, both defendants filed timely notices of appeal. In this appeal, Defendant Sims argues that the trial court abused its discretion by denying his severance motion, that the trial court erred by permitting Defendant Brookshire to cross-examine Mr. Mays about his sexual relationship with Defendant Sims, that the evidence was insufficient to sustain his conviction of aggravated robbery, that the trial court erred by giving certain instructions to and communicating ex parte with the jury, that the trial court erred by denying his post-trial motions for mistrial and severance on the basis of Defendant Brookshire's

incompetence, and that the cumulative effect of these errors prevented him from receiving a fair trial. Defendant Brookshire contends that the trial court erred by denying "trial counsel's" motion for severance, that the trial court erred by permitting the State to question her about her prior convictions of assault, that the evidence was insufficient to sustain her conviction of aggravated robbery, that the trial court erred in its instructions to the jury, and that the trial court erred by finding her competent to stand trial. We will consider each claim in turn.

*I. Severance*

Defendant Sims first contends that the trial court abused its discretion by denying his pretrial severance motion. Despite that his pretrial motion mentioned only the admission of the redacted statement of Defendant Brookshire, Defendant Sims claimed during trial, and reiterates on appeal, that the redactions to his confession altered the substance of his statement by removing substantially exculpatory information, which, in turn, prevented a fair determination of his guilt or innocence.

Defendant Brookshire also argues that the trial court erred by denying "trial counsel's" severance motion. However, a review of the record reveals that the first time Defendant Brookshire raised the issue of severance was in her motion for new trial. As such, she has waived our consideration of this issue for failure to timely raise it. *See* Tenn. R. Crim. P. 14(a)(1)(A).

"The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion." *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant." *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); *see also Dotson*, 254 S.W.3d at 390 ("The test to be applied . . . in determining whether the trial court abused its discretion is whether the [d]efendant was 'clearly prejudiced.'" (quoting *Hunter*, 440 S.W.2d at 6)). "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6); *see also State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

Rule 8 of the Tennessee Rules of Criminal Procedure provides that "[a]n indictment, presentment, or information may charge two or more defendants . . . if each

of the defendants is charged with accountability for each offense included." Tenn. R. Crim. P. 8(c)(1). If the defendant's motion for severance is based upon a co-defendant's out-of-court statement which "makes reference to the defendant but is not admissible against the defendant," the trial court must first determine if the State plans to offer the statement into evidence at trial. Tenn. R. Crim. P. 14(c)(1). If the State does so intend, it must choose one of the following:

> (A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;

> (B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or

> (C) severance of the moving defendant.

*Id.* A defendant may also seek severance on the basis that it is necessary "to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A).

The provisions of Rule 14(c)(1)(B) can be at odds with the completeness rule, which provides that, if the State introduces into evidence only a portion of the defendant's confession at trial, the defendant "is normally entitled to prove the whole of what was said in order for the jury to be able to weigh the whole statement" unless the confession "involv[es] a non-testifying co-defendant." *Denton v. State*, 945 S.W.2d 793, 801 (Tenn. Crim. App. 1996) (citing *Curry v. State*, 397 S.W.2d 179 (Tenn. 1965); *State v. Brett Patterson*, No. 88-245-III (Tenn. Crim. App, Nashville, Dec. 8, 1989), *perm. app. denied* (Tenn. Mar. 5, 1990)). "To hold otherwise would be to render impossible the use of a redacted statement in joint trials involving a *Bruton* situation." *Denton*, 945 S.W.2d at 801. In *Bruton v. United States*, the Supreme Court held that admission of a statement of a non-testifying co-defendant which incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation. *Bruton v. United States*, 391 U.S. 123, 126 (1968); *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *Smart v. State*, 544 S.W.2d 109, 111-12 (Tenn. Crim. App. 1976). The use of a redacted statement is acceptable, provided the redaction does not alter the substance of the statement or remove information that is substantially exculpatory. *Denton*, 945 S.W.2d at 801-02; *see also* Tenn. R. Crim. P. 14(c)(1)(B).

In the instant case, Defendant Sims filed a pre-trial motion for severance on the bases of (1) the use of Defendant Brookshire's out-of-court statement, *see* Tenn. R. Crim. P. 14(c)(1), and (2) prejudice to a fair determination of his guilt or innocence occasioned by the presentation of mutually antagonistic defenses, *see* Tenn. R. Crim. P. 14(c)(2). Following a brief hearing, the trial court denied the motion, finding that the State "does not intend to use the statements of the defendants" and that mutually antagonistic defenses "is [not a] sufficient ground[] for" severance.

At trial, however, the State sought to question Sergeant Simpson about the content of the defendants' statements. Concerned that this process would result in piecemeal introduction of the statements, the trial court, following a lengthy hearing outside the presence of the jury, determined that the best course of action would be for the State to introduce into evidence the statements of both defendants, provided that the statements were redacted to remove any reference to the other defendant to satisfy the requirements of Tennesee Rule of Criminal Procedure 14(c)(1)(B). Defendant Sims objected to the introduction into evidence of his own readacted out-of-court statement, claiming that the redaction altered the context of his statement to such a degree that he would be forced to testify in order to properly explain the discrepancies. The trial court disagreed and permitted the State to introduce into evidence, through the testimony of Sergeant Simpson, the defendants' redacted statements.

Defendant Sims later chose to testify and, during his direct examination, sought to admit into evidence his full, unredacted statement. The State objected to the admission of the statement on the basis of hearsay. Following a hearing outside of the jury's presence, the trial court ruled as follows:

> All right. My gut instinct is to allow it. Obviously I recognize argument that's made routinely that a defendant can't introduce his own self-serving statement that it's hearsay unless it's introduced by a party opponent. I'm recognizing all of those but my concern is that the defendant is now here. He's testifying. He's available for cross-examination. [*Bruton*] no longer is an issue. We have issues regarding the rule of completeness. I have previously ruled obviously it does not trump [*Bruton*] but now [*Bruton*] is not a problem.
>
> So for a number of reasons I'm of the opinion that it's admissible. For the record I have conferred with the author of the TENNESSEE CRIMINAL TRIAL PRACTICE procedure in reference to Judge Ward's treatise on trial procedure,

- 12 -

criminal procedure, I'm looking at Section 23.6 – actually Page 719 and his comments, "Defendant cannot introduce his own self-serving exculpatory statements made prior to trial unless the defendant testifies and is available for cross-examination," and there is a list of cases, numerous cases, that deal with that issue.

And again the biggest obstacle as far as I'm concerned to overcome is the fact that [Defendant] Sims is available for cross-examination and at that point I don't believe that this issue becomes an issue and therefore I'm going to allow it if [Defendant Sims's trial counsel] is asking to move his original statement into evidence. The unredacted version I think is permissible as a prior consistent statement if that's the status it's in but also that I think the defendant has a right to put on that proof and I'm not going to interfere with the defendant's right to put on proof. Under these circumstances I think it's permissible so I will allow it.

Defendant Sims's statement reads, in relevant part, as follows, with the redacted portions bracketed and in italics:

[*Me and Sherry were talking about getting some money and I told her we could go to Bruce's house and get some money. We*] walked to his house on Trezevant, I had a key and I know the alarm code because I used to live there, then I went upstairs and he was sleeping and I told him to give me some money. He told me he was not going to give me any money and I told him that he was that I needed some money. He grabbed his phone and I grabbed his arm and put it behind his back[. *That is when she came in*] and [*then we*] handcuffed him [*and she told him to get down on the floor.*] I started to look in the bathroom for money. I came back in there and [*I saw her hit him in the leg with that thing and I told her not to hit him again.*] He was hollering my name, so I commenced to looking some more. Then I came back in and [*she done put a shirt over his face and she had him in the closet.*] He was hollering for me and told me that he would give me some money if I would take the shirt off his head. So I took the shirt and handcuffs off. [*She started talking about not taking the handcuffs off.*] So I went to the bathroom and looked

under the sink in the vanity and in the closet and did not find anything. I came back in there and he told me he would give me the money if I would just leave. He told me that he would write me something that he gave me the money if I would just leave. He wrote me a note to me that he gave me the money voluntarily and that he tried to proposition me and signed it. He took me to a drawer in his bedroom and gave me some money and the keys and asked me not to take his phone. I took the phone anyway and I told him that I would bring it all back to him. [*So we left and*] I locked the door behind me. [*We*] took the car to some side street off Bellevue. [*She had called somebody and they met us there. He took us back over to Whitman.*]

. . . .

I did not mean for it to happen like this. [*I did not mean for her to hit him like that,*] he is an old guy. I am sorry [*for what we did.*]

In this appeal, Defendant Sims contends that because the redactions distorted his statement and removed exculpatory information that would have supported his defense, the trial court should have granted his motion for severance. Defendant Sims relies on *Bruton* and *Denton* for the proposition that redacted statements are inadmissible if the redactions alter the statement's substance or removes substantially exculpatory information. *See Bruton*, 391 U.S. at 126; *Denton*, 945 S.W.2d at 801-02.

Defendant Sims's reliance on these cases to support his position is misplaced. *Bruton*, *Denton*, and Rule of Criminal Proceudre 14(c)(1) are not designed to protect the defendant from redaction of his *own* statement implicating a co-defendant but rather from the inculpatory statement of a co-defendant through the redaction of the "out-of-court statement of a co-defendant" who "makes reference to the defendant." Tenn. R. Crim. P. 14(c)(1). Defendant Sims, however, is not complaining about the admission of Defendant Brookshire's statement, in which she inculpated Defendant Sims in the crimes at issue; he is complaining that the redaction of *his* statement removed references to Defendant Brookshire's role in the crimes. Subsection (B) of Rule 14(c)(1) makes it clear that severance can be avoided if all references to the "moving defendant," *i.e.*, Defendant Sims, are deleted from the statement of the co-defendant, *i.e.*, Defendant Brookshire, and the redacted confession "will not prejudice the moving defendant." *Id.* To the extent that Defendant Sims appeals the denial of his severance motion on the basis of the admission of his own redacted out-of-court statement, we find no abuse of

discretion in such denial because his erroneous reliance on Rule 14(c)(1) avails him nothing.

Moreover, Defendant Sims's assignment of error on the basis that the admission of the redacted statement forced him to testify in order to introduce the complete, unredacted version is inapt. Defendant Sims's statement was unquestionably inadmissible hearsay, *see* Tenn. R. Evid. 801, 802, subject to no exception, *see* Tenn. R. Evid. 803. Although the State would have been able to introduce the statement into evidence as an admission by a party-opponent pursuant to Tennessee Rule of Evidence 803(1.2)(A), no exception to the hearsay rule permitted Defendant Sims himself to introduce the statement into evidence. Although the trial court ruled that the statement was admissible as a prior consistent statement, prior consistent statements are inadmissible as corroborative evidence of the witness's testimony unless there has been an impeaching attack on the witness's testimony. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Because the statement was admitted into evidence during Defendant Sims's direct examination, no opportunity for impeachment had arisen, and, as such, it could not qualify as a prior consistent statement. Any error attendant to its admission, however, is harmless because admission of the statement in its entirety actually benefitted Defendant Sims.

At any rate, even if Defendant Sims's entire, unredacted statement had not been admitted into evidence, the redacted portions of his statement were not substantial enough to justify severance to prevent a fair determination of his guilt or innocence pursuant to Tennessee Rule of Criminal Procedure 14(c)(2)(A). Because, as will be addressed more fully herein, Defendant Sims was criminally responsible for the actions of Defendant Brookshire, the fact that references to her involvement were redacted from his statement does nothing to lessen his cuplability.

Because Defendant Sims has failed to show he was clearly prejudiced by being jointly tried with Defendant Brookshire, we find no abuse of discretion in the trial court's decision to deny the motion for severance.

*II. Evidentiary Issues*

*A. Defendant Sims*

Defendant Sims next contends that the trial court erred when it allowed Defendant Brookshire to cross-examine Mr. Mays regarding his homosexual relationship with Defendant Sims, asserting that the testimony was irrelevant and unfairly prejudicial.

Prior to trial, the trial court issued the following ruling with respect to Defendant Brookshire's cross-examination of Mr. Mays:

> [Defendant] Brookshire has a right to defend herself and if she's going to be tried with [Defendant] Sims as a codefendant, she has a right to attack the credibility of the victim. And it goes to bias or prejudice. Obviously, it's a relationship – I assume from all of what you're telling me a relationship between the victim and a codefendant. And if we're going to try both defendants together, whether one chooses not to attack the credibility of the victim or not, the other one has a right to.
>
> And if that goes to this very relationship, then it's relevant.

At trial, Defendant Brookshire asked Mr. Mays if he had a prior sexual relationship with Defendant Sims, and Mr. Mays responded, "Not really, we did have sex one time." On redirect examination, Mr. Mays clarified that Defendant Sims had initiated their singular sexual encounter, but Mr. Mays acknowledged that he had "previously attempted to initiate sexual encounters" by "[k]ind of flirting around."

The propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court. *See State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Absent a clear abuse of discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984). In addition, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). Furthermore, "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616.

We see no abuse of discretion in the trial court's decision to permit this line of cross-examination. That Mr. Mays had a prior relationship with Defendant Sims was certainly relevant to show either bias or prejudice pursuant to Rule of Evidence 616, and the relationship was further relevant to the issue of Mr. Mays's credibility as a witness, per Rule of Evidence 611(b). As such, we will not interfere with the trial court's exercise of this discretion.

## B. Defendant Brookshire

Defendant Brookshire argues that the trial court erred by allowing the State to cross-examine her about her prior assault convictions, contending that the convictions were admitted to show propensity to commit the current offenses and were therefore inadmissible under Tennessee Rule of Evidence 404(b). The State counters that the questions concerning the prior convictions were proper impeachment under Tennessee Rule of Evidence 609.

During the State's cross-examination of Defendant Brookshire, the State asked if her "testimony to the jury today was that you were lying to protect [Defendant] Sims . . . when the police came to arrest you." Defendant Brookshire responded in the affirmative and asked if she could explain. When the State acquiesced, Defendant Brookshire testified as follows:

> Being out there with [Defendant Sims] – when I first met him I had a job with Desoto County Board of Education and I had a night job too working in a care [sic]. I worked two jobs. I had my own apartment, my own car. I was a mother. I was a rent payer. I tried to do right. Things happened. We got involved. I ended up making the wrong decisions. I'm put on the streets somewhere I've never been.

> I've [sic] not a spoiled brat but I had an upbringing – I had a decency placed in me that I grew up with and when he introduced me to living on the street, that man right there was my god because he knew more than I did. He protected me from people. Even though – it's hard to explain you-all. He had me. He had me right there and he used me and it didn't seem like he was using me at the time. I thought he loved me. It felt like love and I was going to do anything for that love because he made it seem like he was doing anything for me.

> Don't get that look on your face now, [Defendant Sims], don't get that look now. So, yeah, when they asked, I protected him every way that I could because I thought that's what he was doing for me.

At this point in the testimony, the State requested a bench conference. The trial court excused the jury, and the State argued that Defendant Brookshire, by vouching for her

- 17 -

good citizenship, had opened the door for questions about the assault convictions she had amassed prior to meeting Defendant Sims. Defense counsel requested to make "a small argument just to protect the record," and then stated as follows:

> My argument would be that she stated that she had two jobs, had an apartment and was paying her bills. She said that being on the streets with [Defendant Sims] she had to learn how to be on the streets and survive on the streets and therefore that's why she looked at him as her god. She did not say anything about I've never gotten in trouble before or anything like that. It dealt with being able to live on the streets and therefore I'd say that – that I don't know where having a domestic violence conviction has anything to do with surviving on the streets.

Defense counsel made no further argument in support of his objection. The trial court agreed that Defendant Brookshire had "opened the door" and permitted the State to question Defendant Brookshire about assault convictions she had received in 2004 and 2005 prior to meeting Defendant Sims in 2007. Defense counsel did not request a limiting instruction nor was one given.

When the jury returned to the courtroom, the State resumed its cross-examination of Defendant Brookshire, and the following exchange occurred:

> Q: Now, Ms. Brookshire, your difficulties started before you met [Defendant] Sims. Correct?
>
> A: Sure.
>
> Q: You were in fact convicted of an assault that happened on March 13th of 2004 in April of 2004. Correct?
>
> A: Yes.
>
> Q: And you were also convicted for an assault that happened in June of 2004 back in December of 2004. Correct?
>
> A: That's correct.

Q: And you were also convicted of a domestic assault that happened in September of 2005 in October of 2005. Correct?

A: That's correct.

Q: And all those were in Tipton County before you met Mr. Sims?

A: That's correct.

Q: Nothing further, Judge.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

- 19 -

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Subject to certain conditions for admissibility, Tennessee Rule of Evidence 609 authorizes the use of proof of a witness's prior convictions to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or false statement. *Id.* 609(a)(2).

In the instant case, both Defendant Brookshire and the State are mistaken as to the evidentiary rule at issue. The crimes the State sought to use in its cross-examination of Defendant Brookshire were all misdemeanors that did not involve dishonesty or false statement and, as such, did not qualify for admission under Rule 609. Similarly, admission of these assaultive crimes does not generally fall within the ambit of Rule 404(b) because the State was not seeking to admit them to prove identity, intent, mistake, or the like. Rather, the true nature of the State's use of the assault convictions was to impeach Defendant Brookshire through fact contradiction, a device that is recognized by our courts. *See, e.g., State v. McKinney*, 74 S.W.3d 291, 317 (Tenn. 2002) (appendix). Through fact contradiction, a cross-examining party inquires about facts that conflict with the witness's testimony to show indirectly that the witness is untruthful. *See* Neil P. Cohen *et al.*, Tennessee Law of Evidence § 6.07[4][a] (6th ed. 2011). Here, the State used Defendant Brookshire's 2004 and 2005 assault convictions as a means of contradicting Defendant Brookshire's assertions that, prior to meeting Defendant Sims, she had been a hard-working, "decen[t]" citizen who had "tried to do right" and who had "ended up making the wrong decisions" after she "got involved" with Defendant Sims.

We recognize that the questions concerning the prior assault convictions elicited evidence of prior bad acts that tended to show Defendant Brookshire's propensity

for violence on specific occasions, which is generally prohibited under Rule of Evidence 404(b). *See* Tenn. R. Evid. 404(b). The problem with employing a 404(b) analysis at this juncture is that Defendant Brookshire's objection to the introduction of the assault testimony was not predicated on the grounds of Rule 404(b). *See, e.g.,* Tenn. R. Evid. 103(a) (error may not be predicated upon an evidentiary ruling without a timely objection that specifically states the ground of objection); *State v. Korsakov*, 34 S.W.3d 534, 545 (Tenn. Crim. App. 2000) (defendant may not base an objection to the admission of evidence on one ground at trial and "then base his argument on another ground, such as the violation of Rule 404(b), Tenn. R. Evid., on appeal"). Rather, Defendant Brookshire argued that the door to admission had not been opened via her direct examination testimony. Thus, the possible error in allowing this line of cross-examination will not be noticed by this court unless it qualifies as plain error.

We consider several factors to determine when to notice plain error:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting and approving factors set forth in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Our supreme court emphasized that "all five factors must be established by the record before [the supreme court] will recognize the existence of plain error." *Id.* at 283. Moreover, "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.*

We conclude that we are not presented with a case in which we are compelled to notice plain error. Because Defendant Brookshire did not base an objection on Rule 404(b) and did not request a hearing on that basis, *see* Tenn. R. Evid. 404(b)(1), the trial court did not "determine that a material issue exist[ed] other than conduct conforming with a character trait" that would have supported the use of the evidence, and, if so, it did not determine whether the probative value of the evidence was outweighed by the "danger of unfair prejudice," *see* Tenn. R. Evid. 404(b)(2), (4). Moreover, the State did not have an opportunity to argue or show that the evidence was admissible for "other purposes" than propensity. *See* Tenn. R. Evid. 404(b). Thus, we are hampered by the inability to discern that a clear and unequivocal rule of law was necessarily breached. *See Smith*, 24 S.W.3d at 282.

Furthermore, Defendant Brookshire made no request for a limiting instruction. In the absence of such an instruction, the evidence of the prior assault convictions was available for unrestricted use by the jury. *See id.* at 279 ("A trial court . . . generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection.").

In conclusion, we find no plain error with respect to the State's cross-examination of Defendant Brookshire.

*III. Sufficiency*

Next, both defendants contend that the evidence adduced at trial was insufficient to support their convictions of aggravated robbery. Specifically, both defendants argue that the State failed to establish that the walrus tusk was a deadly weapon. In addition, Defendant Sims asserts that the proof was insufficient to show he was criminally responsible for Defendant Brookshire's actions with respect to the walrus tusk, and Defendant Brookshire claims that double jeopardy principles prevent her conviction of aggravated robbery when she was acquitted of both especially aggravated kidnapping and aggravated kidnapping.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §

39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(2). "'Serious bodily injury' means bodily injury that involves . . . [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or [a] broken bone of a child who is eight (8) years of age or less." *Id.* § 39-11-106(a)(34) (2010).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

Here, the proof adduced at trial established that Defendant Sims and Defendant Brookshire entered Mr. Mays's residence in the middle of the night, and Defendant Sims handcuffed Mr. Mays's hands behind his back. When Mr. Mays did not immediately give in to Defendant Sims's demands for money, Defendant Sims began rifling through a chest of drawers while, a few feet away, Defendant Brookshire beat Mr. Mays with his own walrus tusk. Mr. Mays testified that Defendant Brookshire beat him "several times" with the tusk, striking him in the head, ribs, and legs, and photographs introduced into evidence by the State showed the injuries to his head and leg. Mr. Mays stated that the walrus tusk was approximately 24 inches long and described it as "not quite as heavy as a baseball bat," although Defendant Brookshire testified that the tusk was "heavier than a damn baseball bat." Defendant Sims stole Mr. Mays's cash, wallet, checkbook, car keys, cellular telephone, and vehicle, and Defendant Brookshire stole the walrus tusk. Given the size and similarity to a baseball bat, the walrus tusk was certainly capable of being used to cause death or serious bodily injury, and this court has

repeatedly recognized that a baseball bat can be a deadly weapon. *See State v. Donald Prescott*, No. W2012-02454-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Apr. 11, 2014); *State v. Michael David Fields*, No. E2010-02446-CCA-R3-CD, slip op. at 35 (Tenn. Crim. App., Knoxville, Apr. 30, 2013), *perm. app. denied* (Tenn. Sept. 11, 2013); *State v. Steven Watson*, No. W2008-00452-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Jackson, Aug. 6, 2009). Accordingly, we find the evidence was sufficient to establish that the walrus tusk used to beat Mr. Mays qualified as a deadly weapon.

In addition, the evidence sufficiently established that Defendant Sims and Defendant Brookshire entered Mr. Mays's residence with the intent to rob him; that Defendant Sims was a few feet away when Defendant Brookshire was beating Mr. Mays with a deadly weapon; and that Defendant Brookshire beat Mr. Mays "several times" before Defendant Sims intervened and told Defendant Brookshire to stop the assault. Under these circumstances, Defendant Sims was criminally responsible for the actions of Defendant Brookshire and is therefore guilty of aggravated robbery.

Finally, we find no merit in Defendant Brookshire's contention that her acquittals of especially aggravated kidnapping and aggravated kidnapping – both of which require the use of a deadly weapon – dictate that double jeopardy principles prevent a conviction of aggravated robbery. "The rendering of inconsistent verdicts has always been an exclusive privilege and prerogative of the jury, and it is not [a reviewing court's] duty to unravel the ratiocinations of the jury's collective logic." *Jackson v. State*, 477 S.W.2d 213, 216 (Tenn. Crim. App. 1971). As the supreme court explained in *Wiggins v. State*,

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973). Accordingly, no infirmity attends Defendant Brookshire's conviction of aggravated robbery.

In conclusion, the evidence is sufficient to support both Defendant Sims's and Defendant Brookshire's convictions of aggravated robbery. Although not raised by the defendants on appeal, we hold the evidence likewise supports both defendants'

convictions of kidnapping.

## IV. Instructions to Jury

The defendants raise a number of issues concerning the trial court's instructions to or communication with the jury. First, Defendant Sims contends that the trial court erred by instructing the jury that it had altered the defendants' statements "for legal reasons." Second, both defendants claim that the trial court erred by charging the jury with a sequential jury instruction. Finally, Defendant Sims argues that the trial court erred by engaging in ex parte communication with the jury during deliberations.

### A. Defendants' Statements

While cross-examining Sergeant Simpson, Defendant Sims requested a hearing outside the presence of the jury to ensure that the questions he intended to ask regarding the defendants' redacted statements were appropriate. The trial court granted the request, and, following a brief hearing in which counsel for both defendants asked their proposed questions to Sergeant Simpson, the jury returned, and counsel for Defendant Sims resumed his cross-examination. When counsel asked Sergeant Simpson if, during his interview of Defendant Brookshire, she had mentioned "anything about Mr. Mays being in the closet," the trial court instructed counsel to approach the bench because he had asked an unapproved question. Before allowing counsel to continue his cross-examination, the trial court instructed the jury that the defendants' redacted statements, which had just been admitted into evidence, had "been altered under my orders for legal reasons" and that they were "not to concern [them]selves with that." Defendant Sims did not object to this instruction.

Defendant Sims's failure to lodge a contemporaneous objection to the trial court's instruction results in a waiver of plenary review of this issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987). Moreover, we see no basis for noticing the error despite waiver. *See* Tenn. R. App. P. 36(b).

### B. Sequential Order Instruction

During jury deliberations in the instant case, the jury made the following inquiry: "If we cannot all agree on the charge we are currently on, can we move to the

next lesser charge and then go back to the previous charge if we decide to?" In response, the trial court sent back the instruction that required the jurors to consider each offense in sequential order. On appeal, both defendants argue that this instruction was given in error.

The law on the issue of sequential jury instructions is clear, as reviewed and set forth by the supreme court in *State v. Davis*:

> [W]here a criminal defendant is entitled to jury instructions on lesser-included offenses, the trial court shall instruct the jury to consider the offenses in order from greatest to least within each count of the indictment and . . . it shall not proceed to consider any lesser-included offense until it has first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense.

*State v. Davis*, 266 S.W.3d 896, 910 (Tenn. 2008). Because the trial court clearly followed the law in responding to the jury's query with the sequential order instruction, the trial court committed no error.

The defendants' sole basis for assigning error to this issue is to urge this court to follow the "reasonable efforts method" advocated by Justice Wade in his *Davis* concurrence:

> "Under this method, jurors may render a verdict on a lesser-included offense if, after full and careful consideration of the evidence, they are [first] unable to reach agreement with respect to the charged crime. Thus, the jury may deliberate on a lesser offense if it either (1) finds the defendant not guilty on the greater charge, or (2) after reasonable efforts cannot agree whether to acquit or convict on that charge."

*Davis*, 266 S.W.3d at 911 (Wade, J., concurring) (quoting *State v. LeBlanc*, 924 P.2d 441, 442 (Ariz. 1996)). As we have already indicated, the supreme court has held sequential jury instructions to be proper, and we are obliged to follow this holding. Accordingly, we decline the defendants' invitation.

## C. Ex parte Communication

At some point during jury deliberations, the jury sent a handwritten note to the trial court, which read, "If it is believed that [Defendant] Sims is guilty of aggravated

robbery through criminal responsibility – Is he guilty of aggravated robbery?" Beneath this, the trial judge responded, "Yes," followed by his signature and the date. Because the trial transcript contains a full record of the disposition of the sequential jury instruction request and no record whatsoever of this communication, we must conclude that the trial court responded to the jury's request *sua sponte* and without the prior knowledge of the parties. Counsel for Defendant Sims avers that he first learned of the communication when he reviewed the appellate record.

Trial courts should refrain from communicating with deliberating juries by passing notes. *State v. Mays*, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984). To prevent even the appearance of judicial partiality or unfairness, any proceedings involving the jury after it has retired for deliberations should be conducted in open court and in the defendant's presence. *State v. Tune*, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993); *Smith v. State*, 566 S.W.2d 553, 559-60 (Tenn. Crim. App. 1978). The proper method for fielding jury questions during deliberations is to recall the jury, counsel for both parties, the defendant, and the court reporter and to resolve the matter on the record. *Mays*, 677 S.W.2d at 479.

The failure to follow the proper procedure, however, is subject to harmless error analysis. *Tune*, 872 S.W.2d at 928; *Mays*, 677 S.W.2d at 479. If the defendant has not been prejudiced by an inappropriate response, reversal is not required. *Tune*, 872 S.W.2d at 928. Here, the trial judge's simple response of "yes" to the inquiry was a proper statement of the law. As such, his method of response, while inappropriate, did not prejudice Defendant Sims, and the error is accordingly harmless.

## V. *Competency of Defendant Brookshire*

Defendant Sims asserts that the trial court erred by denying his post-trial motion for a mistrial and severance, and Defendant Brookshire contends that the court erred by denying her motion for new trial, on the basis that Defendant Brookshire was incompetent to stand trial.

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a mentally incompetent person from being put to trial." *State v. Reid*, 213 S.W.3d 792, 808 (Tenn. 2006) (citing *Pate v. Robinson,* 383 U.S. 375, 378 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000)). That said, "[i]n Tennessee, a criminal defendant is presumed to be legally competent." *State v. Johnson*, 401 S.W.3d 1, 17 (Tenn. 2013) (citing *State v. Reid*, 164 S.W.3d 286, 306-07 (Tenn. 2005); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)). As such, the defendant bears the burden of establishing his incompetence by a preponderance of the evidence in the trial court. *See Reid*, 164 S.W.3d at 306-08.

The assessment of competency is multi-pronged. To be deemed competent, a defendant must possess "'the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and assist in preparing his [or her] defense.'" *Johnson*, 401 S.W.3d at 17 (quoting *Reid*, 164 S.W.3d at 306). "A defendant may prove his or her incompetency with evidence of the defendant's 'irrational behavior, his [or her] demeanor at trial, and any prior medical opinion on competence to stand trial.'" *Johnson*, 401 S.W.3d at 17 (citing *State v. Kiser*, 284 S.W.3d 227, 246 (Tenn. 2009) (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975))). The trial court's findings regarding the defendant's competence "are conclusive on appeal unless the evidence preponderates otherwise." *Oody*, 823 S.W.2d at 559.

Following the defendants' February 2013 convictions in the instant case, the trial court became concerned about the status of Defendant Brookshire's competency based on "some allegations that she made and a lot of letters that she wrote to [the trial court] and to Mr. White, who was representing her." After relieving Mr. White as Defendant Brookshire's counsel to avoid any conflicts and appointing Ms. Carriker to take over, the trial court ordered a competency evaluation of Defendant Brookshire and conducted a competency hearing in November 2013.

At the hearing, Doctor Wyatt Nichols, a clinical psychologist, testified that, in response to a court order to determine her competency, he initially evaluated Defendant Brookshire on April 12, 2012. At that initial meeting, Doctor Nichols learned that Defendant Brookshire was on an antipsychotic medication to treat bipolar disorder. Doctor Nichols noted that Defendant Brookshire was "hyper verbal," "disorganized," and "irritable" at the meeting. Athough Doctor Nichols had "some doubts" that Defendant Brookshire would be "able to control herself or be competent to proceed if she were not on medication," he believed her to be competent.

Doctor Nichols next saw Defendant Brookshire on March 7, 2013, approximately 3 weeks after the conclusion of trial. At that time, Doctor Nichols found her to be "so psychotic [he] could not hold a conversation with her." He determined that Defendant Brookshire had been off her medication for approximately five months at that time and that she "[p]robably couldn't even control herself in the courtroom" during her trial. After reviewing her trial testimony, Doctor Nichols opined that it was "very disorganized," that she "sounded manic," and that he did not believe she would have been a competent witness. Based on Defendant Brookshire's presentation on March 7, Doctor Nichols recommended that she be transferred to Memphis Mental Health Institute ("MMHI") for further evaluation. Defendant Brookshire was admitted to MMHI on June 19 and discharged on July 8, 2013. Doctor Nichols acknowledged that doctors at MMHI did not prescribe any medication to Defendant Brookshire.

Doctor Nichols last saw Defendant Brookshire on October 17, 2013. She was back on medication, and he found her to be competent at that time. On cross-examination, Dr. Nichols acknowledged that Defendant Brookshire understood the role of her attorney at trial; that she understood the prosecutor was "not her friend"; that she understood the roles of the judge and jury at trial; and that she understood and could attempt to minimize those things which would negatively impact her at trial. Doctor Nichols testified that Defendant Brookshire's incompetency stemmed from her inability to "work with her attorney and sit in a courtroom and understand what's going on." Doctor Nichols conceded, however, that nothing in the transcript indicated that Defendant Brookshire was ever held in contempt or lost control during trial.

Rita Anagho, a psychiatric nurse at the jail where Defendant Brookshire was housed, testified that she saw Defendant Brookshire on February 20, 2013, and that she had been off her medication for approximately two months at that time. Ms. Anagho stated that Defendant Brookshire exhibited psychotic and delusional behavior, accusing her attorney of having sexual intercourse with her and stating that her attorney had "floated on the air and injected syphilis on her."

Patricia Booker, Defendant Brookshire's mother, testified that a family friend abused Defendant Brookshire when she was four years of age and that Defendant Brookshire began exhibiting behavioral problems at the age of nine. Defendant Brookshire was first hospitalized at the age of 12 for one day but was released and told "she was okay." Sometime after the hospitalization, Defendant Brookshire was diagnosed with "oppositional behavior" and bipolar disorder. As a teenager, Defendant Brookshire spent "[a] couple of years" at an inpatient program called Youth Town, and, after her release, she developed a substance abuse problem.

Ms. Booker testified that she noticed Defendant Brookshire's delusional behavior prior to trial and that the delusions continued after the trial. Ms. Booker admitted that Defendant Brookshire did not appear to be afraid of her attorney during the course of the trial and that Defendant Brookshire never made any delusional statements during breaks in the trial.

At the April 30, 2014 hearing on Defendant Brookshire's motion for new trial, the trial court made the following findings with respect to Defendant Brookshire's competency:

> [T]he issue with regard to [Defendant] Brookshire's mental health really came to light post trial when there was some allegations that she was delusional in the jail and made some statements to Mr. White and to staff in the jail that caused

some concern to the [c]ourt. Obviously caused some concern to Mr. White. At that point he was relieved because of the allegations that had been made and Ms. Carriker took over. And since that time we've had several hearings and introduced testimony and records as to [Defendant] Brookshire's post trial condition and whether or not any opinion of the medical professionals this would have impacted her at the time of trial.

The [c]ourt will take into account all of that testimony. And I do think that and I have said and I feel that [Defendant] Brookshire has some mental health problems. I think there was substance abuse problems coupled with mental health problems that led her to have some serious issues in her personal life. However, I observed her demeanor during the course of this trial. I listened to her testimony and I will admit that it was colorful in an unflattering way. And yet I also find that it was very detailed. It was very systematic. It was very much self-serving. And I do not find that there was anything that I recall from the testimony that would strike me as delusional in the nature of the testimony. Again, I think all of the specifics and detailed information that was provided was consistent with not only [Defendant] Sim[s]'s testimony but with the victim's testimony, with the crime scene investigation of the house. All of the fact[s] were consistent. And I didn't see other than, you know, again, her colorful language and her emotional testimony that there was anything delusional about her testimony.

And tak[ing] the statement that you have offered to me from Mr. White that he was aware of her psychological history and was aware of the potential for problems and did not detect anything. And obviously as soon as the trial was over with and preparation for sentencing, he detected something and brought it to our attention immediately. And so we've had all of the subsequent tests and, again, analysis and testimony. But I'm satisfied from the statement offered by Mr. White that he did not detect anything that would indicate to him that she was not competent. And would not have gone forward if he felt she was not competent. Obviously would have brought it to this [c]ourt'[s] attention if

- 30 -

he felt she was not competent before he put her on the witness stand. I think she was voir dired about the testifying. And I this [c]ourt didn't detect anything that would indicate she was delusional are [sic] non-competent at the time. And, therefore, I don't find that there's any proof that's been presented to me that at the time of this trial she was suffering under such mental disorders that would cause her to be non-competent in understanding what was occurring and assisting counsel and testifying in a cohesive manner that was consistent with all the facts of the case.

I don't find that there's anything there that would cause me to believe that she was not in control of her faculties and was able to assist counsel and able to testify in this case. So although I do recognize that she suffers from some serious mental health issues and substance abuse problems . . . I do not find there was bases [sic] for me to rule that her testimony nor her actions in the course of this trial indicated a lack of competent [sic] such that it impacted or affected the proof that was presented in this case. So I don't find that there's a basis for me to grant a new trial based upon that.

The trial court likewise denied Defendant Sims's post-trial motion for a mistrial and severance.

In our view, the record does not preponderate against the findings of the trial court. Although Doctor Nichols retrospectively questioned Defendant Brookshire's competence to stand trial, he conceded that Defendant Brookshire understood the roles of the attorneys, judge, and jury in the trial and that she understood and could attempt to minimize those things which would negatively impact her at trial. Nothing indicated that Defendant Brookshire was unable "'to understand the nature and object of the proceedings against [her], to consult with counsel and assist in preparing [her] defense.'" *Johnson*, 401 S.W.3d at 17 (quoting *Reid*, 164 S.W.3d at 306)). Defendant Brookshire's testimony and behavior at trial, though "colorful in an unflattering way," was not indicative of incompetence; indeed, as found by the trial court, her testimony was "detailed," "systematic," "consistent," and not at all "delusional."

Defendant Sims likens this case to that of *State v. Carruthers*, in which the supreme court reviewed "the effect of one defendant's self-representation on a co-defendant's right to a severance." *State v. Carruthers*, 35 S.W.3d 516, 553 (Tenn. 2000). The court determined that pro se litigant Carruthers displayed inappropriate behavior

during trial, elicited incriminating testimony, and called an unfavorable witness, all of which prejudiced his co-defendant, and the court reversed the co-defendant's conviction and remanded for a new trial. *Id.* at 553-554. Defendant Sims is mistaken in his analogy. Defendant Brookshire's testimony and behavior at trial was in no way similar to the antics of the pro se defendant in *Carruthers*.

We conclude that the evidence does not preponderate against the trial court's finding that Defendant Brookshire was competent to stand trial. Accordingly, we find no error in the trial court's denial of Defendant Sims's post-trial motion for a mistrial and severance or in the denial of Defendant Brookshire's motion for new trial.

## VI.  Cumulative Error

Finally, Defendant Sims contends that the cumulative effect of the trial court's errors inured to his prejudice. Having considered each of Defendant Sims's issues on appeal and concluded that he is not entitled to relief for any, we need not consider this issue any further. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## Conclusion

The defendants have failed to establish entitlement to relief on any of the issues presented. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE